# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| ROBERT (BOB) FORMBY, on behalf of himself and all others similarly situated, Plaintiff, | CLASS ACTION |
| | JURY TRIAL DEMANDED |
| vs. | |
| Deloitte & Touche, LLP and Deloitte, LLP, Defendants. | No. |

---

## CLASS ACTION COMPLAINT

---

Gordon Ball, Esq. (TN Bar #001135)
*Pro Hac Vice* to be filed
gball@gordonball.com
**GORDON BALL, PLLC**
3728 West End Avenue
Nashville, Tennessee 37205
Tel: (865) 525-7028

*Counsel for Plaintiff*

Thomas H. Bienert, Jr. (CA Bar #135311)
*Pro Hac Vice* to Be filed
Alexis Federico (CA Bar #313392)
*Pro Hac Vice* to be filed
**BIENERT, KATZMAN, LITTRELL, WILLIAMS**
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
949-369-3700
tbienert@bklwlaw.com

*Counsel for Plaintiff*

C. Mark Warren (GA Bar 738210)
cmark@warrenandgirffin.com
John McCown (GA Bar 486002)
john.mccown@warrenandgriffin.com
300 West Emery, Suite 108
**WARREN & GRIFFIN, PC**
Dalton, GA  30720
706-529-4878

*Local Counsel for Plaintiff*

1

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 6

II.   JURISDICTION AND VENUE .................................................................... 14

III.  THE PARTIES ................................................................................................ 15

   A.  Lead Plaintiff. ........................................................................................... 15

   B.  Defendants. ............................................................................................... 15

   C.  Relevant Non-Parties. .............................................................................. 16

IV.  FACTUAL BACKGROUND AND ALLEGATIONS OF FRAUD................ 18

   A.  Southern's Fraud. ..................................................................................... 18

      1.  The May 2014 COD was of utmost importance to Southern and its shareholders. ....... 18

      2.  Southern knew early on that it was not going to make the May 2014 COD and that its
cost overruns would be borne by its shareholders. ............................................. 21

      3.  Southern repeatedly misled its shareholders and made materially false statements and
omitted material information about the Kemper Plant's cost and completion date.............. 30

   B.  Deloitte's Responsibilities as Southern's Auditor. ............................................. 55

      1.  Deloitte's Financial Reporting and Generally Accepted Accounting Principles........... 55

      2.  Regulatory Accounting. .................................................................................. 57

      3.  The Independent Role of the External Auditor. ............................................. 57

      4.  Deloitte was obligated to follow PCAOB standards when conducting its audits of
Southern's financial statements. ............................................................................ 60

2

5.   Deloitte was required to exercise due professional care and professional skepticism when auditing Southern's financial statements....................................................... 62

6.   Deloitte was required to understand Southern's business and to identify and respond to red flags affecting Southern's financial statements. .............................................. 63

7.   Deloitte was responsible for obtaining sufficient appropriate evidence to afford a reasonable basis for its audit report of Southern's financial statements. ............................. 70

8.   Deloitte was required to review Southern's quarterly statements on Forms 10-Q filed with the SEC. .................................................................................................. 72

C.   Deloitte's audits of Southern's 10-Ks were "no audits at all." ......................................... 73

D.   Deloitte failed to take required action concerning material misstatements in Southern's 10-Qs......................................................................................................................... 80

E.   Deloitte revealed relevant auditing procedures to the investing public for the first time in February 2020. .......................................................................................................... 82

F.   Deloitte's false and misleading statements and omissions resulted in "no audit at all." ... 86

V.   SAFE HARBOR ................................................................................................................ 88

VI.   PRESUMPTION OF RELIANCE ..................................................................................... 88

VII.   CLASS ACTION ALLEGATIONS ................................................................................. 90

VIII.   CAUSES OF ACTION ................................................................................................... 92

IX.   PRAYER FOR RELIEF .................................................................................................... 95

X.   JURY DEMAND. .............................................................................................................. 95

Lead Plaintiff, Robert (Bob) Formby, by and through his undersigned counsel, individually and on behalf of a class of similarly situated persons and entities, bring this federal securities class action against Defendants Deloitte & Touche, LLP and Deloitte, LLP (collectively "Defendants" or "Deloitte"), on behalf of himself and on behalf of a class consisting of all persons and entities who purchased, acquired, or otherwise held, or sold, the publicly traded securities of The Southern Company ("Southern") between May 10, 2013 to February 20, 2020, inclusive (the "Class Period"), and who were damaged thereby. Lead Plaintiff's and the Class's claims arise under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 17(a)(1)-(3) of the Securities Act.[1]

This case arises out of the abandonment of Southern's "clean coal" electric power plant in Kemper, Mississippi ("the Kemper Plant") in 2017. Deloitte was Southern's auditor during the times relevant to this lawsuit, and as such, had a duty to act as gatekeeper ensuring Southern's accurate reporting of information to the investing public. Instead of doing so, Deloitte intentionally and recklessly violated its professional responsibilities, failed in its role of gatekeeper, and deceived investors about Southern's accounting for and expected completion of the Kemper Plant. Deloitte's untrue statements and omissions of material facts concerning the Kemper Plant operated as a fraud and deceit upon plaintiff and others similarly situated in connection with their purchases and value of Southern securities during the class period.

---

[1] Presently, it does not appear that the Eleventh Circuit recognizes a private right of action under Section 17(a). *See generally U.S. S.E.C. v. Big Apple Consulting USA, Inc*., 783 F.3d 786, 797 (11th Cir. 2015). The Supreme Court has not ruled on this issue yet and Plaintiffs bring this cause of action to preserve it for appeal.

Southern had been permitted to construct the Kemper Plant based on its assurances that it would complete the construction project by May 2014 and do so within a budget of $2.88 billion. Based on those assurances, Southern was provided hundreds of millions of dollars of federal tax credits. Southern and Deloitte knew well before May 2014 that the project was woefully behind schedule and over budget, but omitted material information reflecting these realities and falsely represented that the plant would be built within budget and on time so that Southern could maintain the tax credits, receive hundreds of millions in Department of Energy grants and other federal incentives, hide its losses from the investing public, inflate its reported assets, and deceptively insulate its stock from loss that would have resulted from accurate reporting. As deadlines came and went, Deloitte and Southern intentionally continued to significantly under-report the losses and over-state the progress and completion date of the Kemper Plant. After years of trickling out misleading information about the project's finances and progress, and omitting other material information, Southern was sued in January 2017 by certain shareholders for misleading them about the Kemper Plant. Within a few months thereafter, Southern abandoned its effort to build the necessary components of its "clean coal" facility at the Kemper Plant altogether and reported losses totaling over $3 billion dollars on the project—losses that Southern and Deloitte had known about long before but failed to timely and accurately report.

Southern's illegal acts led to civil lawsuits against Southern and certain Southern executives and employees ("Southern Parties") and resulted in several settlements. The role of Deloitte in this scheme, however, was not known until recently. This lawsuit addresses Deloitte's intentional and reckless reporting of false material information and omission of material information to the investing public about the ill-fated Kemper Plant.

Lead Plaintiff's allegations concerning matters other than himself and his own acts are based upon the investigation conducted by and through counsel. The investigation included, among other things, the review and analysis of: (i) public statements made by Deloitte; (ii) transcripts, press releases, news articles, earnings calls, and other public statements issued by or concerning Southern and Mississippi Power Company ("Mississippi Power") (and together with Southern , the "Company"); (iii) reports and other documents filed publicly by Southern with the U.S. Securities and Exchange Commission ("SEC"), including Deloitte's audit reports; (iv) testimony and other information submitted to the Mississippi Public Service Commission concerning the Kemper Plant; (v) documents publicly available from the class action filed in the Northern District of Georgia, *Monroe County Employees' Retirement System et al. v. The Southern Company et al*., Case No. 1:17-cv-00241-WMR (N.D. Ga.); (vi) *Vinyard v. Thomas Fanning et al*., Case No. 1:17-cv-00725-MHC (N.D. Ga.); (vii) regulatory orders, associated filings, and testimony; and (viii) other publicly available information.

## I.    <u>INTRODUCTION</u>

1.      Deloitte's audit practice is the largest of the "Big 4" accounting firms that audit electric public utilities in the United States. For years, Deloitte has represented itself as one of the foremost experts in the world in assisting and auditing energy projects. Deloitte is the leading auditor of the power and utilities sector, providing audit services to 55 percent of the Fortune 1000 power and utilities companies. During all times relevant to this Complaint, Deloitte acted as the independent audit firm of Southern and its subsidiary utility companies, including Mississippi Power.

2.      Southern is holding company that owns four public utility companies, the Southern Power Company ("Southern Power"), and other direct and indirect subsidiaries. The four traditional public utility companies—Alabama Power Company, Georgia Power Company, Gulf

Power Company, and Mississippi Power Company—are vertically integrated utility companies, providing electric service in Southeastern states.

3.      Electric public utilities are, by definition, monopolies. In the Southern service areas, Southern is the sole provider of electricity to commercial and consumer customers. Because of this unique situation, Southern's electric rates are regulated by outside governmental agencies—in this case, the Mississippi Public Service Commission ("MPSC"). To recover the prudent costs of its operations and a return on its capital (i.e., profit), Southern must file a rate case with the MPSC, who decides whether to approve Southern's proposed rates, based on a variety of factors. Any costs that the MPSC determines cannot be recovered from Southern's rate payers (i.e., Southern's customers), are necessarily funded by Southern's shareholders.

4.      Public utilities are generally required to follow Generally Accepted Accounting Practices ("GAAP"). They are also required to follow Regulatory Accounting that, at times, differs from GAAP for non-regulated companies. For example, Regulatory Accounting recognizes a concept that electric utilities have only two sources of funding for operations: (1) electric rates that a utility charges to and recovers from customers; and (2) shareholder expenses (i.e., any amount a utility is not permitted to recover from its customers for any reason). While GAAP requires a Company to correlate revenue and expenses to the most directly linked time and activity, Regulatory Accounting requires a company to correlate the timing of revenue and expenses with the rates approved or disapproved by public service commissions.

5.      In short, when a public service commission rejects a company's bid to recover expenses from its ratepayers, the company must record those expense in its financial statements as losses and disclose those expenses as losses to its shareholders ***in a timely manner after its bid to***

*recover those expenses is rejected*. GAAP does not permit a company to defer those losses and record them in subsequent quarters.

6.    An independent auditor's failure to abide by these principles can have disastrous consequences to shareholders. And that is exactly what happened here.

7.    As the first "clean coal" plant in Mississippi, and one of the first in the United States, the Kemper Plant was supposed to prove that it was possible to produce clean electricity from dirty coal by turning lignite coal—one of the dirtiest types of coal with the lowest energy potential—into clean synthetic gas that could be used to power the plant (a process commonly referred to as "coal gasification"). It was a large and highly visible undertaking that was supposed to be a model for future coal-based power generation and help reinvigorate the dying coal industry. It was also set to bring thousands of much needed jobs to Mississippi, the nation's poorest state.

8.    Deloitte and Southern were fully aware that a key to the success of the Kemper Plant was Southern's ability to keep the project on time and on budget. To do this, the Kemper Plant needed to achieve a commercial operation date ("COD") of no later than May 11, 2014. If timely constructed by the COD, the Kemper Plant would qualify for nearly $700 million in federal incentives, including $412 million in investment tax credits and $270 million in clean coal power initiative funds.

9.    Conversely, Southern's failure to meet budget and the May 2014 COD would have disastrous consequences to the project and ultimately Southern's shareholders. *First*, the MPSC, which approved the Kemper Plant, imposed certain restrictions, including a cap of $2.4 billion (later increased to $2.88 billion), on the amount of construction costs that the Company could charge to ratepayers. This meant that Southern's shareholders would foot the bill for any costs exceeding $2.88 billion. *Second*, the Company's failure to achieve COD would result in the loss

of hundreds of the nearly $700 million in federal incentives, including government grants, tax incentives, and loan guarantees (including more than $270 million in clean coal power initiative funds and $412 million in federal investment tax credits—much of which Southern was required to repay). *Third*, the Company had a deal with South Mississippi Electric Power Association ("SMEPA"), whereby SMEPA deposited $275 million in exchange for a 15% ownership interest in the Kemper Plant, which was repayable with interest in the event the Kemper Plant was not completed on time. (SMEPA later cancelled the deal due to project delays and Southern was required to repay SMEPA's deposit plus approximately $26 million in interest).[2] *Fourth*, delays would jeopardize the Company's agreement with Treetop Midstream Services, LLC ("Treetop"), which agreed to purchase the $CO_2$ byproduct generated by the Kemper Plant and construct a pipeline to offload the $CO_2$ to its facilities if the plant was timely constructed. (Treetop and other related parties filed an arbitration claim against the Company for $500 million, which later settled for an undisclosed amount).[3]

10.     Southern and Deloitte intentionally assured the market that the Kemper Plant would be completed on schedule and on target and would achieve its May 2014 COD. Southern assured its shareholders that the coal gasifier—a critical piece of the Kemper Plant"—was proceeding "exceptionally well." In the months leading up to the COD, Southern and its employees continued to represent that Southern would make its COD, telling its shareholders that construction was "halfway," "70 percent complete," and nearly "75 percent complete."

11.     Southern and Deloitte were lying. The reality was that the Kemper Plant fell significantly behind schedule early in the process and Southern and Deloitte knew well in advance

---

[2] Southern's 2016 Form 10-K at II-08.
[3] Southern's 2017 Form 10-K at II-36.

that Southern's promised May 2014 completion date was impossible to meet. Instead of disclosing this information to its shareholders, Southern and Deloitte continued to understate the costs and timeline associated with the Kemper Plant and conceal problems and cost overruns as they occurred.

12.    In October 2013, Southern acknowledged that that it would not meet the May 2014 completion date. At that time, Southern and Deloitte also knew that it was significantly over-budget and would cost dramatically more money to complete the Kemper Plant than reported.

13.    After failing to meet the COD, instead of acknowledging the degree to which the project would need additional funding and substantially more time to complete, Southern and Deloitte continued it misrepresentations and omissions about the Kemper Plant for years.

14.    Recent disclosures and investigation reveal that Deloitte also made false representations and omitted material information about Southern's cost overruns and delays and inability to meet promised timeframes regarding the Kemper Plant and the losses that Southern failed to record. On February 20, 2020, Southern released its audited 2019 Annual Report, Form 10-K ("the February 2020 Report"). In that annual report Deloitte publicly disclosed for the very first time how it addressed Critical Audit Matters ("CAMs") relating to the construction of Southern power plants. Specifically, in the February 20, 2020 filing, Deloitte provided information relating to its auditing of another Southern power plant, Plant Vogtle Units 3 and 4, a nuclear plant that had been under construction in Burke County, Georgia, since 2013, the very same time frame of the Kemper Plant construction. In the February 2020 Report, Deloitte set forth its process for auditing CAMs on that project, explaining that it "tested the effectiveness of internal controls over the on-going evaluation, monitoring, and disclosure of matters related to the construction and ultimate cost recovery of Plant Vogtle Units 3 and 4." Deloitte revealed that it involved

construction specialists to help evaluate the processes for on-going evaluation and monitoring of the construction scheduled and to assess the related uncertainties that would impact Southern's cost recovery in its investment in the plant's construction. Deloitte attended meetings with Company officials, project managers, contractors, independent monitors, and co-owners of the project to evaluate the project's status regarding the construction schedule, changes to the schedule, and cost forecasts so that Deloitte could assess the impact on the Company's financial statement disclosures. Deloitte also said it had read the reports of external independent monitors employed by the relevant public service commission to evaluate the completeness of the Company's disclosures. Deloitte had taken other actions, including comparing the Company's financial statement disclosures to information Deloitte gathered to evaluate whether there were any material omissions in the financial statements. In short, Deloitte explained that it was heavily involved in the construction process, progress and costs and would know if a project was or was not on budget and whether the project would or would not make its deadlines.

15.     Deloitte's description of the detailed involvement it had with Southern on another energy project being constructed and audited at the same time as the Kemper Plant suggested that Deloitte would have been similarly involved in Southern's construction process at the Kemper Plant. Follow up investigation revealed this to be true, leading to discovery of the testimony of Cynthia G. Shaw, Comptroller of Mississippi Power Company (MPC), in a prudency hearing before the MPSC on May 15, 2015, that revealed that Deloitte acted as a special auditor of the Kemper Project itself. Ms. Shaw stated that:

> **Kemper Project costs have also been subject to auditing procedure performed by Deloitte & Touche LLP (Deloitte) in connection with their annual audits of MPC's financial statements. Their audit is based on procedure that meets the standards of the Public Company Accounting Oversight Board (PCAOB). Deloitte has issued unqualified opinions on the company's financial statements since the inception of the Kemper project and prior.**

**Internally, MPC and SCS management personnel perform extensive review and oversight of the Kemper Project costs in accordance with internal controls, and Southern Company Internal Audit also has reviewed various aspects of the Kemper Project Costs. Internal Audit, after consultation with the Southern Company Audit Committee of the Board of Directors, MPC Board of Directors, Southern Company management, and MPC management, considered identified risks in its determination of the areas that should be audited. As shown in documents previously filed in this proceeding, all reportable Internal Audit findings have been addressed**.

16.     Deloitte's acknowledgment that it audited the Kemper Project costs and its detailed description of what it does when auditing CAMs make clear that Deloitte would not only have known that Southern's statements concerning that Kemper Plant were false and misleading, but that Deloitte prevented accurate information concerning the true status of the Kemper Project and its associated losses from timely reaching Southern's shareholders.

17.     Deloitte was legally obligated to correct Southern misstatements about the status of the project—corrections Deloitte wrongfully chose not to make regarding the Kemper Project disclosures—or withdraw as Southern's auditor. Deloitte did neither. To the contrary, Deloitte repeatedly gave unqualified, "clean" audit reports on Southern's financial statements and internal control over financial reporting, including in its SEC filings, that contained false material statements and omissions about the Kemper Project. Deloitte misleadingly told shareholders that Southern's financial statements concerning the Kemper Plant were "present[ed] fairly, in all material respects" and in accordance with GAAP, and that Deloitte was reasonably assured that Southern's financial statements were free of material misstatements. In doing so, Deloitte disseminated false information that misled shareholders into believing that Southern would complete the Kemper Plant within the timeframes and budget represented. Deloitte did so despite possessing real-time evidence that Southern could not possibly achieve the represented goals.

18.     Southern and Deloitte knew well before May 2014 that Southern could not recover these cost overruns from its ratepayers, because MPSC denied Southern's request to do so. Instead

of disclosing these overruns as losses in the fall of 2014 (at the latest) as required, Southern and Deloitte hid them from investors and instead dribbled out these losses *over twenty-six (26) quarters* in its filings with the Security and Exchange Commission ("SEC"). Deloitte also wrongly permitted Southern to claim billions of dollars in construction work in progress as an asset on its balance sheets in direct contravention of GAAP, thus further misleading shareholders.

19.     After years of blown-out budgets and missed construction deadlines, Southern announced in June 2017 that it would suspend its clean coal efforts and soon switched to burning only natural gas. Two years later, Southern announced that it was abandoning construction of the project altogether. It demolished its coal gasification system in October 2021. Southern's "clean coal" plant was a failure.

20.     By the time Southern abandoned the clean coal Kemper Plant project, it had incurred over $9 billion in costs, including over $6.2 billion in cost overruns, associated with its failed clean coal Kemper Plant. The disclosure of these losses over dozens of quarters (instead of timely reporting them in real time) hid the true extent of the losses born by Southern shareholders as a result of the Kemper Plant

21.     The accurate and timely reporting of Southern's billions in losses on the Kemper Plant significantly impacts the price of share price. For example, when Southern released its 2017 Q2 10K belatedly reporting $3,012,000,000 in losses on the Kemper Plant—less than half of the actual losses on the Kemper Plant—its stock price dropped from $50.08 to $47.91 per share. With over a billion shares outstanding, that quarterly report led to over $2 billion in lost stock value. Had Southern properly reported the full $6.2 billion of losses when it should have, its stock would have incurred a more significant immediate loss far earlier in time. Instead, by trickling out the $6.2 billion loss over six and a half years, Southern masked the extent of its losses and improperly

propped up its stock price with false information, thereafter causing purchasers to pay inflated prices for the stock based on inaccurate information and suffer significant losses in value of their stock when the losses were recorded.

22.     Both Southern and Deloitte knew the billions of dollars Southern spent on construction could never be passed onto the ratepayers, due to the project delays, cost overruns, and ultimate failure of the project. This meant that the only other source of funding, Southern's shareholders, would bear the loss, whatever the amount. By the time Southern finally disclosed the full extent of its losses related to the Kemper Plant and Deloitte's fraud was revealed, Southern's shareholders had suffered billions in losses.

## II.     <u>JURISDICTION AND VENUE</u>

23.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Securities and Exchange Act of 1934 (the "Exchange Act") and 15 U.S.C. § 77v of the Securities Act of 1933 (the "Securities Act"). The claims asserted herein arise under Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder, and Section 17(a)(1)-(3) of the Securities Act (15 U.S.C. § 77q).

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. §1391(b). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

25.     In connection with the acts and conduct alleged in this Complaint, Defendant Deloitte, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities markets.

III.    **THE PARTIES**

    A.    **Lead Plaintiff.**

26.    Lead Plaintiff, Robert Formby, purchased Southern common stock during the Class Period in 2015 and was damaged thereby.

    B.    **Defendants.**

27.    Defendant Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, the United States affiliate of the "Big 4" international accounting firm, Deloitte Touche Tohmatsu Limited, headquartered in the United Kingdom. Deloitte & Touche, LLP offers audit and enterprise risk services. As part of its business, the firm provides clients with audit and financial statement reviews. Other services include financial reporting, regulatory updates, employee benefit audits and venture capital services. Deloitte & Touche, LLP has more than 90 offices and 330,000 employees in the United States. It is a Delaware limited liability partnership duly organized under the laws of the State of Delaware. It is registered with the PCAOB and Office of the Georgia Secretary of State and is authorized to conduct business, and in fact does business, in Georgia, including in the Northern District of Georgia.

28.    Deloitte, LLP manages U.S. subsidiaries that offer tax, consulting, and financial advisory services. Deloitte, LLP is the largest professional service organization in the United States with U.S. revenue, in 2021, of $50.2 billion. It is a Delaware limited liability partnership duly organized under the laws of the State of Delaware. It is registered with the Office of the Georgia Secretary of State and is authorized to conduct business, and in fact does business, in Georgia, including in the Northern District of Georgia.

29.    Defendant Deloitte & Touche, LLP and Deloitte, LLP are collectively referred to as "Defendants" or Deloitte.

30.     Deloitte & Touche LLP was retained by Southern as its independent auditor. Defendant Deloitte & Touche LLP issued reports on Southern's financial statements for at least the years ending December 31 for the years 2011 through 2020. In each of those reports, Defendant Deloitte & Touche LLP certified that it had audited those statements in accordance with GAAP and that the statements presented the financial position of Southern fairly and in conformity with GAAP. Every audit report was a "clean opinion"—an unqualified report that the financial statements were fairly presented in all material respects. This is the highest level of audit report a CPA may issue. These reports were all false and misleading.

31.     26.     Deloitte & Touche LLP also audited the financial statements of Southern's operating subsidiaries, including Alabama Power, Georgia Power, Mississippi Power, Southern Power, and Gulf Power, among others.

**C.      Relevant Non-Parties.**

32.     Non-party Southern is an American gas and electric utility holding company headquartered in Atlanta, Georgia and based in the southern United States. Southern is currently the second largest utility company in the United States in terms of customer base. Southern maintains its headquarters at 30 Ivan Allen Jr. Boulevard, N.W., Atlanta, Georgia 30308 and has executive offices in Birmingham, Alabama. Southern's operating subsidiaries include public utility companies located throughout the Southeastern United States such as Alabama Power, Georgia Power, Mississippi Power, Southern Power, and Gulf Power, among others. During the Class Period,[4] Southern stock was traded on the NYSE, with its common stock trading under the ticker symbol "SO." Through its subsidiaries, it serves approximately nine million customers in six states.

---

[4] The Class Period is defined as May 10, 2013 to February 20, 2020.

33.     Non-party Mississippi Power Company ("Mississippi Power") is an investor-owned electric utility and wholly owned subsidiary of Southern. Mississippi Power is headquartered in Gulfport, Mississippi, and operates as a vertically integrated utility providing electricity to retail customers within the State of Mississippi and to wholesale customers in the Southeastern United States. The Kemper Plant was built by Mississippi Power and was intended to diversify its investments—the majority of which were in natural gas.

34.     Southern Services, Inc. ("Southern Services") is the shared services division of Southern and is headquartered in Birmingham, Alabama. Southern Services provides administrative, engineering, and operational services to all Southern's operating divisions, including Mississippi Power. Southern Services provided the engineering, design, and construction services for the Kemper Plant.

35.     The Mississippi Public Service Commission ("MPSC") regulates telecommunications, electric, gas, water, and sewer utilities in Mississippi. The MPSC has regulatory authority over Mississippi Power.

36.     Burns and Roe Enterprises, Inc. ("BREI") was a power plant design, engineering, and construction company hired by the Mississippi Public Utilities' staff to act as an Independent Monitor ("independent Monitor") of the Kemper Plant. BREI was responsible for monitoring the regulatory, financial, and auditing aspects of the Kemper Plant and conducted two primary reviews concerning the Kemper Plant and reported its findings.

37.     Greg Zoll ("Zoll") was BREI's project manager for the Kemper Plant project. He was a mechanical engineer with over 35 years of experience in developing, designing, engineering, permitting, and constructing power projects, plants, and facilities.

38.     Brett Wingo ("Wingo") was an engineer hired by Southern as a subcontractor. His duties included helping to make scheduling and design decisions on the Kemper Project.[5] Once an advocate for the plant, Mr. Wingo became a whistle-blower who alleged the Company mismanaged the Kemper Project and fraudulently concealed cost overruns and project delays.[6]

## IV.     FACTUAL BACKGROUND AND ALLEGATIONS OF FRAUD

39.     Southern's fraud concerning the Kemper Plant is well known by now. As discussed above, it has been the subject of serval lawsuits, a recent settlement, and scathing public criticism. What has not been discoverable, until recently, was that Deloitte also made false representations and omitted material information about Southern's cost overruns and delays and inability to meet promised timeframes regarding the Kemper Plant and the losses that Southern failed to record.

### A.     Southern's Fraud.

1.     The May 2014 COD was of utmost importance to Southern and its shareholders.

40.     On December 13, 2006, Southern announced that its subsidiary, Mississippi Power, planned to construct a new "clean coal" plant located in Kemper County, Mississippi, that would incorporate integrated coal gasification combined cycle ("IGCC") technology. In its press release, the Company claimed that the Kemper Plant would cost approximately $1.8 billion (excluding costs for the adjacent mine and carbon dioxide pipeline) and that it would be completed in 2013.[7]

41.     The IGCC technology involved two main components—a coal-gasification plant and a combined-cycle power plant. The coal-gasifier, the most critical and complex part of the

---

[5] https://www.enwoven.com/collections/view/2914/timeline?eventId=12482.
[6] *See generally* Ian Urbina, *Piles of Dirty Secrets Behind a Model 'Clean Coal' Project*, The New York Times, available at https://www.nytimes.com/2016/07/05/science/kemper-coal-mississippi.html (last visited Feb. 3, 2022) (cited passim as "New York Times Expose").
[7] https://southerncompany.mediaroom.com/index.php?s=&item=826.

project, would turn lignite coal mined on the Kemper site into synthetic gas ("syngas"). After the impurities were removed, the syngas would burn in a conventional natural gas-style plant.  In addition, the Kemper Plant would capture and sequester at least 65% of the $CO_2$ produced by the plant to be used by third parties (like Treetop) in enhanced oil recovery.

42.     In 2009, Mississippi Power received notification from the Internal Revenue Service ("IRS") formally certifying that the IRS had allocated $133 million of Internal Revenue Code §48A tax credits (Phase I) to Mississippi Power for the construction of the Kemper Plant. The Company's ability to use these credits depended upon its meeting the IRS certification requirements, including the May 2014 COD. The COD is the date when a power plant has (1) been commissioned, (2) been determined to be mechanically complete, (3) passed all required performance and emissions tests and (4) been deemed ready to reliably supply electrical energy and capacity to the transmission grid.

43.     Also in 2009, Mississippi Power filed for a certificate of public convenience and necessity ("CPCN") for the Kemper Plant with the MPSC, stating that the new plant was necessary to meet the needs of its customers and reduce utility costs. Kimberly Flowers, Vice President of Mississippi Power, testified before the MPSC that the possibility of cost overruns on the Kemper Plant was "unlikely and comparatively insignificant."

44.     In May 2010, after extensive negotiations with federal and state officials (including raising the cost cap from $2.4 billion to $2.88 billion), the MPSC issued the CPCN for the Kemper Plant. The accompanying order ("2010 Order") (1) approved a construction cost cap up to $2.88 billion (any costs above this amount could not be passed on to Mississippi Power customers and would instead be borne by Southern shareholders) and (2) approved a ratepayer-funded allowance to cover the financing of construction costs up to and including the May 1, 2014 COD (any

construction financing costs incurred after this date could not be passed on to Mississippi Power customers and would likewise be borne by Southern shareholders).

45.     The 2010 Order further mandated that the MPSC would "retain Independent Monitors[8] to assist the Commission in its statutory duties by monitoring Project progress, reviewing costs and plans, and advising the Commission on questions of prudence and on the wisdom of continuing the Project." However, on March 15, 2012, the Mississippi Supreme Court reversed the MPSC's CPCN order for the Kemper Plant and directed the MPSC to correct its order to include substantial evidence supporting its decision granting the CPCN. The MSPC voted to re-certify the construction on the Kemper Plan on April 24, 2012, and issued a new CPCN authorizing the acquisition, construction, and operation of the Kemper Plant. The order required Mississippi Power to provide monthly progress reports to the MPSC and to indicate whether the "[p]roject is on schedule and on budget." The MPSC's certification was based on Southern's representation that it would meet the May 2014 COD and its budget of $2.88 billion.

46.     In a July 28, 2010 earnings call with shareholders and analysts, Southern announced that the MPSC had approved the Kemper Plant, that the estimated cost of the Kemper Plant was $2.4 billion and that it would be in service by May 2014. Southern's Chief Financial Officer (Paul Bowers) and its Chief Executive Officer (David Radcliff) told shareholders they were "confident" that they could keep the costs of the Kemper Plant below $2.4 billion.[9]

47.     On December 6, 2010, the Company broke ground on the Kemper Plant.

---

[8] BREI was engaged in early 2011 as an Independent Monitor for the Project.
[9] In August 2010, Arthur Beattie was appointed CFO and Executive Vice President of the Company, replacing Mr. Bowers as CFO, who at the same time became COO and later President and CEO of Georgia Power, the Company's largest subsidiary.

2.   <u>Southern knew early on that it was not going to make the May 2014
COD and that its cost overruns would be borne by its shareholders.</u>

48.   The Kemper Project experienced significant problems and project delays early on.
Southern was aware of these and knew that the Kemper Plant could not possibly achieve a May
2014 COD—thus jeopardizing $412 million in federal tax credits, $270 million in clean coal power
initiative (including grants received from the Department of Energy), contracts with other
companies, and its rate recovery. Indeed, there were serious doubts as to whether it would ever
become operational.

49.   Documents and recordings provided to the New York Times by whistle-blower and
former Company engineer, Brett Wingo, and interviews the New York Times conducted with over
30 regulators, contractors, consultants, and engineers who worked on the Kemper Project, revealed
that Southern not only "drastically understated the project's cost and timetable" but it repeatedly
tried to conceal problems as they emerged."[10]

50.   Mr. Wingo had recorded conversations with "at least six senior engineers from the
plant [who] said they believed that the delays and cost overruns, as well as safety violations and
shoddy work, were partly the result of mismanagement or fraud."[11] The engineers were aware that
the Company overstated certain milestones to reassure MPSC and Southern's shareholders that the
project would be completed on time and on budget. Donald Falletta, another Company engineer,
told Mr. Wingo during one call that "he too believed that managers were being 'told to lie' about
the pace of progress." Brent Duncan, recounted in a phone call that "managers were being allowed
to 'screw' with the schedule and 'then claim they can meet all these dates, and there's no way.'"

---

[10] The internal documents and recorded telephone conversations referenced in The New York
Times exposé are available at https://www.enwoven.com/collections/view/2914/timeline.
[11] New York Times Expose.

51.     By 2012, Mr. Wingo, who had received glowing performance reviews and was awarded an annual $2,000 "Southern Excellence" employee award, had raised concerns to Southern about its misstatements and omissions concerning the Kemper Plant. Mr. Wingo told his supervisors that other scheduling information that Mississippi Power and Southern were providing to the public was infeasible and misleading.

52.     The Company knew by this time that there was something terribly wrong with its schedule and that the May 2014 COD was not achievable. In 2012 the Company experienced major refractory failure issues in the fabricator which caused a three-to-six-month delay building the gasifier structure, the "centerpiece" of the IGCC technology. This was significant, as project managers (including Mr. Wingo) were told in late 2011 that there "was no time to lose" on the gasifier structure because every day that was lost on building the gasifier would result in a day that would be added to the back end of the project schedule.[12] (As described below, the project schedule had no padding or "float" built in.) Even after experiencing this significant delay to a central component, the Company did not report a shift in its May 2014 COD.

53.     As another example, the Company bragged that it had achieved "first fire," (an important milestone for the gasifier) but this did not actually happen.[13]

> The engineers joked that Mississippi Power, eager to show progress to investors and regulators, overstated certain milestones. For example, it bragged of achieving the "first fire," which involves the lighting of the gasifier, when what they did fell far short of the actual definition, according to Mr. Wingo.
>
> "We burned natural gas in a pilot" light, Brandon Davis, an engineer, said during one phone conversation. "I accomplish that every day in my garage."[14]

---

[12] @ISSUE's August 15, 2017 interview of Brett Wingo, Mississippi Public Broadcasting, available at https://www.youtube.com/watch?v=c1FdTxCbnfU (last visited Feb. 4, 2022).
[13] https://www.enwoven.com/collections/view/2914/timeline?eventId=12714.
[14] New York Times Expose.

54.     Ed Day, Mississippi Power's CEO, tried to tighten control over what information was shared outside of the Company. For example, he wrote in an August 8, 2012 email to senior staff that "'again' no numbers, schedules, or information in general should be communicated to external parties until I review it/them first."[15]

55.     Mr. Wingo was not the only one concerned. Tom Theodore, a scheduling consultant who worked on the Kemper project for about eight months in 2012, "described the company's stated schedule as little more than 'a pretty picture to show everybody that we're all doing wonderful as opposed to what reality showed on the ground.' His predecessors had altered the software so it no longer automatically adjusted the final price and completion date to reflect problems as they emerged, he said."[16]

56.     On June 5, 2013, Yvonne Avila (a Project Engineer for the Kemper Plant) sent an email to Brett Wingard (the Engineering & Procurement Manager for the entire Kemper Plant) alerting him to "two potentially big issues." Avila explained that another manager had instructed her to change the piping quantity needed for construction because an additional 200,000 linear feet of piping was needed to finish the job. Avila recounted that on a call that afternoon, Coy Graham, an Assistant Construction Site Manager over the gasifier, "started going off about how they keep getting [isometric drawings] every week, and that they based all the schedule re baseline off of the drawings they had at the time, and now the numbers keep increasing and they don't even know what is coming out, etc. etc."[17]

---

[15] https://www.enwoven.com/collections/view/2914/timeline?eventId=12559.
[16] New York Times Expose.
[17] https://s3.amazonaws.com/urbina/kemper/2013.06.05_Construction%20Delays%20Frustrate%20Project%20Engineer.pdf (last visited Feb. 8, 2022).

57.     "After Mr. Wingo provided company officials with a binder of documents corroborating his allegations, he said he was ordered to stop sending emails on the matter because they could become public through litigation." He was also removed from email distribution lists on high level emails, "isolated as a project manager." A short time later, he was asked to step down from his project management role.[18]

58.     Mr. Wingo was fired in February 2016— a firing the Occupational Safety and Health Administration later found illegal. Mr. Wingo "refused an offer of roughly $975,000 from the company to keep quiet, according to interviews and court records related to his whistle-blower claims. Southern was then granted a restraining order, later dropped, forbidding him from speaking publicly about the plant, court records show."[19]

59.     Southern employees were not the only ones who raised concerns that Southern Company was misrepresenting its progress on the Kemper Plant. PM Alliance, Inc. ("PM Alliance") the scheduling contractor for the Kemper Project resigned from the Kemper Project in February 2014, because the project plan did not "fairly and accurately" represent the remaining work to be done. Earlier that same month, PM Alliance had warned Southern that it could not support using hypothetical and misleading information in a published schedule that could ultimately be used by investors, regulators, and the public.

60.     The Kemper Plant's Independent Monitor responsible for monitoring the regulatory, financial, and auditing aspects of the Kemper Plant, BREI, also raised concerns in a series of highly critical reports it filed with the MPSC from 2012 to 2014.

---

[18] New York Times Expose.
[19] New York Times Expose.

61.     In November 2012, the Independent Monitor published an Independent Project Schedule and Cost Evaluation ("IPSCE") Report, wherein it stated that the Kemper Plant's schedule had slipped roughly three months, and that, as a result, the total project cost would exceed $3 billion. Greg Zoll, BREI's project manager for the Kemper Plant, wrote that Southern Company services was "not utilizing some basic project management and project controls tools and techniques that are available and customarily used in the industry for a project of this magnitude." He also highlighted the technology risks associated with the project that could impact the completion date of the Kemper Plant and increase project costs.[20] As expenses and purchases increased, reported construction costs decreased and scheduling times were shortened, trends that Mr. Zoll called "illogical."

62.     In this report, Mr. Zoll explained that there were numerous critical path deliveries (aka project tasks) [21] that were behind the original November 2012 baseline plan. For example, the gasifier refractory lined components were up to three months late. This delay also impacted gasifier structural steel erection and equipment installations above a 605' elevation. As of November 2012, Mr. Zoll determined that these deliveries were about three months behind the original baseline schedule.[22] As another example, the remaining gasifier structural steel installation and gasifier

---

[20] Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Nov. 15, 2012), at 7.

[21] A schedule's 'critical path' is an identification of sequential activities within a schedule that determine minimum time required to complete the project. A delay of any activity in the critical path will delay the project unless workarounds or other mitigating actions are taken to accelerate the remaining work.

[22] Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Nov. 15, 2012), at 25.

components, which needed to be delayed to accommodate the new gasifier delivery dates, could result in up to a five-month delay in completing the gasifier structure and systems.[23]

63.     Based on the project commodity charts, several commodities were behind the original baseline schedule as presented in the Company's monthly production report. Mr. Zoll identified other delays that would impact project completion date, The underground piping was behind the original plan by six months, concrete foundations were three months behind the original plan, structural steel was behind the original schedule by about three months "and continue[d] to slip," and process piping was delayed by at least one month.[24]

64.     He concluded that Southern should use certain "project management and project control tools and techniques" to better "monitor, track and manage the logistics" for the Kemper Plant. In addition, he concluded that the Kemper Plant *was unlikely to be completed by the May 2014* deadline and recommended that the Company "[c]onduct a detailed review of the August 31, 2012, re-baselined schedule to verify and, if necessary, modify the logic, predecessors and successors to each activity." [25]

65.     In response to the November 2012 report, Southern spokesman Tim Leljedal denied that delays reported by the Independent Monitor would negatively impact the Kemper Plant's schedule. "[the Company] remains confident and recently confirmed its cost and schedule projects" for the Kemper Plant, he said.[26]

---

[23] Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Nov. 15, 2012), at 25-27.
[24] *Id*. at 24-25.

[25] *Id*. at 7.

[26] *See* John Downey, Cost Overruns Remain Issue for Gasified-Coal Plants, Charlotte Bus. J., Nov. 29, 2012.

66.     In January 2013, a full-time site monitor was added to the BREI team. BREI's monitoring of the Kemper Plant also included approximately seven trips to Southern's offices in Birmingham, Alabama and monthly visits to the Kemper Plant to monitor and review critical engineering, schedule, and cost aspects of the project. BREI's review covered the period from late 2009 through March 31, 2013.

67.     In April 2014, Mr. Zoll issued a second report, a prudency evaluation. A prudency evaluation is a retrospective analysis of the decision-making process and the activities performed during the licensing, construction, and start-up phases of power plant construction. A prudency evaluations uses specific evaluative criteria to determine whether construction-related decisions were reasonably made, and whether activities were prudently performed. In that report, Mr. Zoll observed that the delay of the gasifier (the critical component of the clean coal plant) 2012 had adversely and "significantly" impacted the schedule.[27]

68.     Further, delayed delivery of major equipment to the site caused "major delays" and impacted the sequencing of the construction and installation of the equipment. He also noted that the growth of major commodities (i.e., concrete, steel, plant piping, and cable) and labor required to build the Kemper Plant had increased dramatically and that "***the increased quantities and man-hours were being added without a change to the COD of the facility,*** which remained at May 2014 as of March 2013."[28] The large increase further crated severe labor congestion (commonly referred to as a "stacking of trades") in tight areas of the plant, which negatively affected labor productivity.[29]

---

[27] Independent Monitor's Prudency Evaluation Report for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Apr. 15, 2014), at 55.
[28] *Id*. at 54.
[29] *Id*. at 49

69.     The prudential report identified other issues impacting the COD, including the delay of available piping, which caused a rippling effect in the procurement, fabrication, construction, and startup phases. This resulted in further inefficiencies and labor expended which pushed the schedule back even further.

70.     Notably, the schedule on which the May 2014 COD was predicated, failed to include any buffer or slack—or what the industry calls "float." Adding float to account for unknowns or delays that may occur, is common practice in the industry especially when the project is challenging. Because there was no "float" built into the schedule, when the Kemper Project dates slipped, the COD was in peril. This was recognized by Black and Veatch ("B&V")—another consultant hired by the MPSC and relied on by Mr. Zoll.

71.     In his April 2014 prudency evaluation, Mr. Zoll concluded that Southern "should have recognized that there was little margin for error with respect to meeting the May 2014 COD." The Kemper Project continued to fail to meet significant milestones, yet the COD was not adjusted.

72.     Mr. Zoll's evaluation focused on the reasonableness of the Company's actions and decisions at the time the decisions were made, or actions taken. At no point did the Independent Monitor armchair quarterback or evaluate decisions made in hindsight. The decisions and actions were judged purely on what was known or should have been known to the Company at the time the decision was made, or the action implemented.[30]

---

[30] *Id*. at 4.

73.    The 2014 prudency report was "filed confidentially" with the MPSC in April 2014. In November 2014, the first news of the 2014 prudency report broke. In response, the Company "vigorously denied the veracity of the report" and related testimony."[31]

74.    Rather than disclose the problems, Southern fervently concealed the scheduling delays and cost overruns, pretending that they arose from "'unknown unknowns,' as Southern's CEO, Tom Fanning, often called them—like bad weather, labor shortages and design uncertainties." Landon Lunsford, a Kemper Plant engineer told Wingo during one recorded call that "[t]he company will never admit the project-management problems because they will attract more scrutiny from regulators. . . 'As long as they can talk away the results as attributable to something else other than just poor performance, the other public service commissions can't hold them over the fire as much,' he added."

75.    According to project engineers, intense pressure to meet the May 2014 COD led to substandard work that, in turn, contributed to further delays. Mr. Wingo described seeing piping in the gasifier structure that was held up by cables and ropes, instead of being supported by pipe hangers.[32] Mr. Wingo and other engineers raised construction quality issues to management, but the executive pressure to keep up with the announced schedule "trumped any sort of quality control on the installation and inspection of [the] piping"—a "major component" of the construction. (The Independent Monitor corroborated this, finding the quality of the pipe and pipe connections were terrible.).

---

[31] *See* Steve Wilson, Report on Kemper Project Casts Embattled Power Plant in Poor Light, Mississippi Watchdog,
https://web.archive.org/web/20160811071540/http://watchdog.org/256865/kemper-schedule/)
(last visited Jan. 26, 2022).
[32] @ISSUE's August 15, 2017 interview of Brett Wingo, Mississippi Public Broadcasting,
available at https://www.youtube.com/watch?v=c1FdTxCbnfU (last visited Feb. 4, 2022).

76.     Further, the construction group would pass certain work packages onto the commissioning group—the group responsible for taking over finished work packages, testing, and verifying their operation. Due to immense executive pressure, the construction team would pass on work packages that were incomplete with a lot of quality control issues to the commissioning group. This would allow the Company executives to advertise to the public that certain milestones were being met, even though substantial construction work still needed to be done on these work packages, work and time which was not added back into the schedule. They were essentially just kicking the can down the road.[33]

        3.     <u>Southern repeatedly misled its shareholders and made materially false statements and omitted material information about the Kemper Plant's cost and completion date.</u>

77.     Despite knowing that it could not possibly meet the May 2014 COD (or the construction cost cap set by the MPSC), the Company nonetheless continued to make numerous materially false and misleading statements and omissions to Southern's shareholders concerning the Kemper Plant that continued to inaccurately paint a rosy picture concerning the plant's progress and repeatedly assured its shareholders that the project would be completed by the May 2014 COD deadline and within budget.

78.     On April 25, 2012, Southern held its quarterly earnings call, in which it assured shareholders that the Kemper Plant's construction costs and the May 2014 COD remained achievable. On the call, Mr. Fanning confirmed that the start-up phase of the Kemper Plant would begin in June 2013. Mr. Fanning also confirmed the May 2014 COD. Specifically, he stated "Initial startup and testing are now only 14 months away. And we remain confident that this project will

---

[33] *Id.*

provide the best value to customers over the long term. Targets remain achievable." Approximately two weeks later, the Company told MPSC of a new cost overrun, which raised the total project price to $2.76 billion. (Southern later revealed that the Company withheld this information from MPSC while it was deciding whether to approve the Kemper Project.).

79.     On May 7, 2012, Southern filed its consolidated Form 10-Q for the first quarter of 2012 with the SEC. The Form 10-Q stated, in part, that "Mississippi Power anticipates that the costs to complete construction of the portion of the Kemper IGCC subject to the construction cost cap will be less than the cost cap but will likely exceed the certificated cost estimate" and that "[t]he Kemper IGCC plant, [was] expected to begin commercial operation in May 2014."

80.     On May 15, 2012, Art Beattie, Executive Vice President and Chief Financial Officer ("CFO") of Southern, presented at the Deutsche Bank Clean Tech, Utilities and Power Conference and stated:

> [P]rogress [at the Kemper Plant] is being made. We'll have first gas to the CT, combustion turbines, in June of next year. We'll have the first heat to the gasifier in October of next year and the first [syn]gas to the combustion turbines in December of next year. So this plant is well on its way. We're about . . . 72% of its costs are confirmed at this point. 90% of costs will be confirmed by the end of this year – so good progress at Kemper County.

81.     On June 8, 2012, Southern issued a news release providing an update regarding the Kemper Project: "[T]he Kemper Plant construction is progressing on schedule and continues to be the best generation option for customers. The plant will be on line May 2014."

82.     Also on June 8, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC. The report stated: "Overall Project Status: Project is on schedule."

83.     On July 6, 2012, Mississippi Power released a status report disclosing a new estimated Kemper Plant cost overrun of $117.9 million, bringing the total cost to $2.88 billion. (Ten days later, a senior manager at the Kemper Plant, Brett Wingard, e-mailed Mr. Wingo and

other engineers at the Kemper Plant and wrote Mississippi Power CEO and President Day wanted "cost cutting ideas" by the next morning, July 17, 2012.[34]).

84.     On July 25, 2012, Southern held its earnings call, where it told its shareholders that the Kemper Plant remained on schedule and that the estimated cost for the project was $2.88 billion. During the call, Mr. Fanning stated, "Our most recently filed status report reflects an estimated cost for the project of $2.88 billion, including a $62 million contingency" and that Southern's "current analysis indicates that the overall cost to customers for [the Kemper Plant] will be less than projected in the original certification."

85.     On August 3, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the MPSC. The report stated: "Overall Project Status: Project is on schedule."

86.     On August 6, 2012, Southern filed its consolidated Form 10-Q for the second quarter of 2012 with the SEC. The Form 10-Q reiterated that "The Kemper IGCC, expected to begin commercial operation in May 2014, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the Kemper IGCC as fuel."

87.     On August 9, 2012, Mississippi Power issued a press release announcing that the Kemper Plant was "nearing peak construction, creating jobs." The press release stated, in part that commercial operation was less than two years away and would be on line by May 2014.[35]

88.     On September 13, 2012, Southern issued a news release that stated:

Recently, Mississippi Power safely completed a major construction milestone at its Kemper County energy facility as plant construction nears the halfway mark. Installed was a section of the plant's gasifier. . . Installation of the gasifier marks a pivotal point in the construction phase of our project and the advancement of 21st century coal technology," said Mississippi Power Vice President of Generation

---

[34] https://www.enwoven.com/collections/view/2914/timeline.
[35] https://southerncompany.mediaroom.com/index.php?s=34171&item=2616.

Development Tommy Anderson. . . . Commercial operation of the 582-megawatt facility is expected to begin May 2014.[36]

89.     On October 5, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC. The report stated: "Project is on schedule."[37]

90.     On October 19, 2012, Southern issued a news release with the headline "Mississippi Power files updated assumptions on Kemper project, confirms costs and schedule remain on target." The news release stated:

> As part of its ongoing review process for the Kemper County energy facility project, Mississippi Power filed updated assumptions to both cost and schedule in its monthly construction report to the Mississippi Public Service Commission. The company confirmed that the project is on schedule to be completed in May 2014 and that cost projections remain on target to stay at or below $2.88 billion . . .
>
> Overall, the project is more than 70 percent complete. The plant is scheduled to begin initial start-up next summer and commercial operation in 18 months.
>
> "With engineering and procurement nearing completion, construction progressing on schedule and key startup milestones approaching quickly, Mississippi Power's projections are that cost and schedule targets are achievable," said Tommy Anderson, vice president of generation development for Mississippi Power.

91.     On November 5, 2012, Southern announced its third quarter 2012 financial results and held a conference call for analysts, media representatives and investors during which Southern represented that the Kemper Plant was on schedule. Specifically, Mr. Fanning stated:

> At Plant Ratcliffe in Kemper County, Mississippi, construction remains on schedule to begin commercial operation in May of 2014. Cost projections remain on target to finish at or below $2.88 billion. We continue to actively manage ongoing pressures on costs and schedule which are typical for a project of this scale. Installation of the gasifiers and assembly is proceeding exceptionally well and the carbon dioxide absorbers are all in place . . . Art [Beattie] and I met recently with Moses Feagin, he's the CFO of Mississippi Power; Ed Day; their regulatory people. We meet regularly on this project.[38]

---

[36] https://www.enwoven.com/collections/view/2914/timeline?eventId=12561.
[37] https://southerncompany.mediaroom.com/index.php?s=34171&item=2647.
[38] https://www.enwoven.com/collections/view/2914/timeline?eventId=12563.

92.     (That same month, Greg Zoll, BREI's project manager for the Kemper Plant project, published a report stating that Kemper's project schedule had slipped roughly three to six months, and that the delays would push the total project cost over $3 billion, as detailed below. Deloitte audits required that they audit the same project schedule. This would include comparing the costs to the actual budget, evaluating project milestones and whether they could be met, evaluating whether the project could be completed in time to recognize tax incentives and rate payer recovery, and estimating the total cost to complete the Kemper Plant. Mr. Zoll wrote that Southern was "not utilizing some basic project management and project controls tools and techniques that [were] available and customarily used in the industry for a project of this magnitude.")

93.     On November 7, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the third quarter of fiscal year 2012. It reiterated the statements previously made that the Kemper Plant was "expected to be in service in May 2014," and also stated that "Mississippi Power continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project."

94.     On November 13, 2012, Southern issued a news release with the headline: "Mississippi Power's Kemper County energy facility achieves major milestones toward completion," which stated:

> With the project now more than 70 percent complete, Mississippi Power's Kemper County energy facility has achieved several major milestones in recent weeks . . . "These milestones are indicators of the tremendous progress being made every day to deliver 21st century coal technology to our customers," said Tommy Anderson, vice president of generation development at Mississippi Power.

95.     On November 29, 2012, in an article published in the Charlotte Business Journal, Southern spokesman Tim Leljedal disputed a report, filed by the Independent Monitor, that

construction costs were likely to exceed $3 billion. The article stated: "According to an email from Southern spokesman Tim Leljedal, Mississippi Power 'remains confident and recently confirmed its cost and schedule projects' for the Kemper County facility."

96.     On December 18, 2012, Southern issued a news release, which stated: "As we enter 2013, the project is nearly 75 percent complete and scheduled to begin commercial operation in May 2014. In six months, the facility will begin initial start-up activities for the combined cycle portion of the plant, which will generate the electricity." (In a December 13, 2012 email, Tim Pinkston, a Kemper Plant senior manager, emails engineers, emphasizing that all internal and external presentations relating to the project must be approved by upper management).[39]

97.     On December 28, 2012, in an AP news article, Mr. Fanning stated: "Everything that I know, this plant was exceedingly well-built and well organized during the construction period."

98.     On January 9, 2013, Southern issued a news release that stated: "'We're less than 16 months from commercial operation and this facility will utilize the cleanest technology available' . . . said Tommy Anderson, vice president of generation development. The project, which is nearly 75 percent complete, is on schedule to be completed by May 2014."

99.     On January 24, 2013, Southern Company issued a news release that stated: "The [Kemper] project is on schedule for completion in May 2014."

100.    On January 25, 2013, Art Beattie participated in Southern's Conference Call with securities analysts to discuss the Kemper Plant. During that call, Mr. Beattie stated: "the project

---

[39] https://www.enwoven.com/collections/view/2914/timeline?eventId=12565.

remains on track for a May 2014 in-service date when it is scheduled to begin providing clean, safe, reliable energy to the citizens of Mississippi."

101.    On January 30, 2013, Southern announced its fourth quarter and fiscal year 2012 financial results and held a conference call for analysts, media representatives and investors during which Southern represented that the Kemper Plant was still expected to be completed and placed in service by the critical May 2014 deadline. Specifically, Mr. Fanning stated:

> The second priority is achieving success with our major construction projects, specifically Plant Vogtle Units 3 and 4 and the Kemper project, both of which are continuing to progress in an outstanding manner . . . Meanwhile, the Kemper project is now 75% complete and remains on track for its May, 2014 commercial operation date. To date, approximately $2.5 billion has been spent on the project. The plant is scheduled to begin start-up activities this summer, with first fire going to the CTs in June, and the first gasifier heat-up taking place in December. Reliable syn gas is expected to begin flowing to the CTs in February, 2014.

102.    On February 26, 2013, Southern issued a news release that stated: "The project is scheduled to begin operation in May 2014."

103.    On February 28, 2013, Southern filed its consolidated Form 10-K with the SEC for fiscal year 2012 (the "2012 10-K"). Deloitte provided a "clean audit" of this report (as described more fully below). The 2012 10-K stated in part that "[t]he Kemper IGCC is scheduled to be placed in-service in May 2014" and that the cost estimate for the project was approximately $2.88 billion.

104.    On March 4, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC. The report stated: "Project is on schedule."

105.    On April 2, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC. The report stated: "Project is on schedule."

106.    On April 23, 2013, Southern and Mississippi Power filed a combined current report on Form 8-K with the SEC announcing cost updates to the Kemper Plant. The Form 8-K disclosed that the Kemper Plant project would now cost $3.42 billion, a $540 million increase from its last

estimate (nearly 20%), blaming additional labor, engineering, and materials costs. That same day, Southern issued a press release. Mr. Fanning stated: "In keeping with our commitment to customers, Southern Company will fully absorb the increased costs related to the Kemper project."

107.   During its April 24, 2013 earnings call, Mr. Fanning acknowledged the $540 million ($333 million after-tax) charge related to cost overruns, but again told shareholders that the May 2014 COD was still achievable and startup activities at the Kemper Plant were 40% complete.

108.   On April 24, 2013, following the release of its first quarter 2013 financial results, Southern held a conference call for analysts, media representatives and investors during which Defendants disclosed a $540 million ($333 million after- tax or $0.38 per share) Kemper Plant cost overrun but, nevertheless, represented that construction of the Kemper Plant was on schedule to be completed and up and running by May 2014. Specifically, Mr. Fanning stated:

> We continue to make tremendous progress at the Kemper site with most of the major components in place, the combined cycles, gasifiers, massive gas absorbers and lignite dome as well as a 75-acre reservoir, the facility's appearance reflects our progress with start-up activities which are now 40% complete . . . We continue to believe that the scheduled in-service date is achievable.

109.   On May 10, 2013, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter 2013, reiterating the financial and operating results stated in the press release. It reiterated the statements previously made that the Kemper Plant had recorded a $540 million ($333.5 million after-tax) charge related to cost overruns at the Kemper Plant, and that the Company did not intend to seek contributions or recovery of the increased costs, which exceeded the $2.88 billion cost cap. The Form 10-Q stated: "The Kemper IGCC [is] scheduled to be placed in service in May 2014."

110.   Also on May 10, 2013, Mississippi Power announced a restatement of its previously issued financial statements because of its incorrectly accounting for the project costs for the

Kemper Plant. In Amendment No. 1 to the 2012 10-K, Mississippi Power restated its financial statements for the year ended December 31, 2012 to recognize a pretax charge for an estimated probable loss for the Kemper Plant of $78 million ($48.2 million after tax).

111.    On May 15, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC. The report stated: "Project is on schedule."

112.    On May 20, 2013, Mississippi Power abruptly announced that Day, the President and CEO of Mississippi Power, was stepping down from his position.[40] Despite reports of Mr. Day's misconduct, on the same day that he resigned, Mr. Day entered into a three-year consulting agreement with Mississippi Power, which entitled him to an annual retainer of $150,000 per year for providing consulting services for "no more than four (4) days during each calendar month."

113.    On June 3, 2013, Mississippi Power issued a Form 8-K which attached the Kemper Plant Monthly Status and Cost Report filed with the PSC. The status report stated: "Project is on schedule."

114.    On July 1, 2013, Southern Company issued a Form 8-K which attached the monthly Kemper Plant status report Mississippi Power filed with the Mississippi PSC. That monthly status report stated: "Project is on schedule."

115.    On July 30, 2013, Southern and Mississippi Power filed a combined current report on Form 8-K with the SEC announcing cost updates to the Kemper Plant and the related recognition that the project would not cost $3.87 billion. On the same date during an earnings call, Southern reassured its shareholders that despite the cost overruns, the Kemper Plant remained on

---

[40] Ray Henry, *Miss. Power CEO Ed Day Out*, Jackson Free Press, May 21, 2013, https://www.jacksonfreepress.com/news/2013/may/21/miss-power-ceo-fired-stonewalling-regulators/ (last visited Jan. 26, 2022).

schedule to meet the May 2014 deadline, with startup activities scheduled to begin in late August 2013 with the firing up of the first combustion turbine.

116.    On July 31, 2013, Southern Company issued a press release announcing its second quarter 2013 financial results. In the press release, Mr. Fanning stated: "Despite recent cost challenges, we are making great progress in the construction of the Kemper County energy facility."

117.    After releasing its second quarter 2013 financial results, on July 31, 2013, Southern Company held a conference call for analysts, media representatives and investors during which Defendants represented that construction of the Kemper Plant was on schedule, still expected to be completed and up and running by May 2014. Specifically, Defendant Fanning stated:

> [C]onstruction at the Kemper County energy facility is also progressing well. Since our last earnings call, the lignite mine has been placed into service and the final heavy lift, as well as a significant portion of the startup activities for the combined cycling unit, has been completed. Recognizing that piping is a key area of focus at this stage of the project, it's important to note that 90% of the piping has been fabricated and almost half is installed. And that we have been achieving our key installation targets for steel and pipe . . . Looking ahead for the remainder of 2013, startup activities include the first fire of the first combustion turbine in late August, [synching] the steam turbine to the grid in October, and heating up the first gasifier by year end. Our May 14 in-service date, to which our construction and startup plans are tied, remains achievable.

118.    On August 6, 2013, Southern filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the second quarter of fiscal year 2013. It reiterated the statements previously made that the Kemper Plant was "scheduled to be placed in-service in May 2014."

119.    On August 30, 2013, Mississippi Power issued a Form 8-K which attached the Kemper Plant Monthly Status and Cost Report filed with the PSC. The report stated: "Mississippi Power plans to meet the May 2014 in-service date; however, the Company could experience

schedule delays associated with construction and startup activities for this first-of-a-kind technology."

120.    On September 12, 2013, Southern Company issued a press release that stated:

Construction milestones reached at Kemper, first fire of CT complete. Gulfport, Miss. – Mississippi Power's Kemper County energy facility has reached several major construction milestones, including the first fire of the facility's two combustion turbines (CT). The first fires were completed Aug. 28 on the first CT and Sept. 4 on the second CT. "Firing up the combustion turbines is an important milestone in both the construction and startup phases of the Kemper County energy facility," said John Huggins, vice president of generation development. . . ."This milestone is further indication that we are one step closer to the startup of the plant."

121.    In October 2013, the Company announced it would not meet its May 2014 deadline and would have to repay the $133 million in federal tax credits as a result. The Company blamed its failure to meet COD on bad weather and additional unforeseen work. During that month's earnings call, Southern told its shareholders that the estimated completion date for the Kemper Plant had slid to the end of 2014. Southern also told its shareholders that the further delay was going to cost between $15 million and $25 million a month. Mr. Fanning blamed the cost overruns on a "mistake on the engineering" saying the Company "agreed to a price cap without having fully done [their] homework on the deal."

122.    Even after acknowledging that it could not meet its May 2014 COD and that it had exceeded its $2.88 billion cost cap, Southern continued to materially misrepresent the status of the Kemper Plant, its estimated completion, and its costs to Southern's shareholders. Southern continued to make misleading positive statements, which suggested that the Kemper Plant would still be completed in 2014 and would be eligible to receive approximately $150 million of additional tax credits.

123.    Instead of presenting a realistic assessment regarding the construction of the Kemper Plant and its estimated date of completion (if ever) and associated costs, Southern also continued to incrementally shift its deadlines and trickle out associated cost overruns.

124.    As the months went on, the completion date for the Kemper Plant continued to be delayed, and the costs of the project continued to increase.

125.    On November 6, 2013, Southern filed its 10-Q for the third quarter 2013, in which Southern stated that it "ha[d] extended the scheduled in-service date for the Kemper IGCC to the fourth quarter 2014 and revised its cost estimate to complete construction to an amount that exceeds the $2.88 billion cost cap." That quarter, Southern recorded $150 million in losses associated with the Kemper Plant.

126.    On January 28, 2014, Southern filed a report with the SEC claiming the Kemper Plant would be operational before the end of 2014 and that its revised cost estimate would be $4.06 billion. During that month's earnings call, Mr. Fanning again placed the blame on Southern's "mistake" in agreeing to a price cap prematurely, but reassured shareholders that "construction of the plant had actually gone pretty darn well" and that the Kemper Plant was "on budget, on schedule on construction."

127.    On February 26, 2014, in response to e-mailed questions from Mr. Wingo regarding suspicious activity surrounding the official Kemper Plant project scheduling database, Babar Suleman, a Southern contract scheduler responsible for controlling access to the database, cautioned Mr. Wingo against further discussions of the suspicious scheduling issues by e-mail.

128.    On February 27, 2014, Southern filed its 2013 10-K with the SEC. Southern claimed that the Kemper Plant "is currently scheduled to be placed in service in the fourth quarter of 2014." Southern also disclosed that, through the end of 2013, the Company recorded pre-tax

charges to income for revisions to the cost estimate of $1.2 billion ($729 million after tax). As described below, Deloitte issued a "clean audit" on this report, claiming it presented fairly, in all material respects, the financial position of Southern and its subsidiaries, and that Southern maintained effective control over financial reporting in all material respects. Southern recorded an additional $40 million in estimated losses associated with the Kemper Plant for the fourth quarter 2013.

129.    Also on February 27, 2014, (the same day that PM Alliance withdrew from the Kemper Project) a noon meeting with Southern and Mississippi Power officials was conducted. At the meeting, John Huggins, a Mississippi Power vice president, presented the misleading schedule that by that time several engineers and schedulers had warned was false and misleading. The schedule claimed the project was 80% likely to finish by December 1, 2014.[41]

130.    Later that night, Mr. Wingo e-mailed John Huggins, warning Mr. Huggins that the Company had provided the public with misleading scheduling information. Mr. Wingo also warned that the Company's "lack of rigor in our project controls are also likely to be in clear and obvious violation of industry standards, best practices and generally accepted principles which, if I'm right, puts [the Company] in clear jeopardy with regards to Sarbanes Oxley Compliance." Mr. Wingo further warned, "If we continue down the path we're on, the project will admit schedule slips only at the last minute, when things can't be hidden, glossed over or blamed away." [42]

131.    On March 10, 2014 at 12:03 p.m., Mr. Wingo called Mr. Fanning and warned him that there was no way that the Kemper Plant project would be completed by the fourth quarter of 2014. During a 21-minute call, Mr. Wingo warned him against signing any financial reports to the

---

[41] https://www.enwoven.com/collections/view/2914/timeline?eventId=12642.
[42] https://www.enwoven.com/collections/view/2914?content=ZJed0.

SEC showing a projected completion of the Kemper Plant project by the end of 2014. Mr. Wingo explained that there was no way the Kemper Plant project would be completed by then and that there was "a fraud being perpetrated on the [Kemper Plant] project, that they hijacked the schedule to make it look like 2014 was achievable."

132.    Around this time, Mr. Wingo also reported his concerns to the compliance department, telling them that the advertised completion date of the end of 2014 was a fraud and there was no way it was possible, and that he expected that the project was years away.

133.    On March 13, 2014, a meeting was held between high-level officials at Mississippi Power and Southern to discuss the fallout of PM Alliance's departure. Joshua Keller of PM Alliance was invited and was in attendance at the meeting because Southern wanted to bring PM Alliance back to the Kemper Plant project. Joshua Keller's notes regarding the meeting quote Bill Boyd, the Company's general manager in charge of Project Planning and Services, as stating during this meeting that things were changed in the schedule in the past to "protect ourselves."[43]

134.    In April 2014, Southern filed a Securities and Exchange Commission report informing federal regulators and shareholders that the Kemper Plant would not be completed by the end of 2014 and set a new completion date for the first half of 2015. It was the first time Southern publicly acknowledged the plant would not be ready until 2015.

135.    On May 5, 2014, analysts at UBS downgraded the Company's rating to "sell" from "neutral," citing the Kemper Plant delays and noting that any costs above $2.9 billion could not be recovered from Mississippi ratepayers.

---

[43] https://www.enwoven.com/collections/view/2914/timeline?eventId=12566.

136.    On May 8, 2014, Southern filed its quarterly Form 10-Q with the SEC for first quarter 2014. Southern revised its cost estimate for the Kemper Plant to "approximately $4.44 billion" and recorded $380 million in estimated losses related to the Kemper Plant that quarter. Southern stated that it "expects to place the combined cycle and the associated common facilities portion of the Kemper IGCC project in service in the summer of 2014" and that the "in-service date for the remainder of the Kemper IGCC is currently expected to occur in the first half of 2015."

137.    On May 30, 2014, Mr. Wingo met with Helen Nalley, the Operations Compliance Director at Southern. In response to Mr. Wingo's concerns of being asked to leave the schedule and project management issues to the leadership currently in place even though those leaders were the same ones who had been proven to be either willful, complicit, or ignorant in fraudulent scheduling, Mr. Wingo was told to "let it go" and that this was not the first time the Company had to "let things go." Mr. Wingo was told that even if the current Kemper Plant project leadership had violated rules and potentially led executives into breaking federal laws, the leadership could not be replaced.

138.    On June 10 and 27, 2014, Mr. Wingo e-mailed Ms. Nalley to follow up on their May 30, 2014 meeting. In the e-mails, Mr. Wingo also described a "lack of management or accountability" resulting from intense pressure to meet expectations and stated Company officials were retroactively filing inspection reports so that the Kemper Plant could be placed into operation.[44]

139.    On July 21, 2014, a hearing was held before the Mississippi Public Service Commission. During the hearing, Mr. Zoll testified that management of the project was

---

[44] https://www.enwoven.com/collections/view/2914/timeline?eventId=12566.

incompetent; that the Company delayed acknowledging major cost increases and delays long after the Company knew or should have known of those changes; as early as November 2012, it was clear that the Company's May 2014 completion date was unachievable; that Mr. Zoll highlighted a projected cost overrun as early as September 2011 that was not acknowledged by the Company until May 2012; and that the Company reported "no impacts" to the MPSC even though the Company had missed deadlines and slipped behind schedule.

140.    During a July 2014 earnings call, Mr. Fanning blamed the challenges of the Kemper Plant on "unknown unknowns" but gave an estimated first gasifier fire expected later in the year. In September, Mr. Fanning sold nearly $47 million worth of his Southern shares, more than 90 percent of his stake in the company.

141.    On August 7, 2014, Southern filed its quarterly Form 10-Q for the second quarter of 2014. Southern stated that "[d]uring 2014, Mississippi Power further extended the scheduled in-service date for the Kemper IGCC to the second quarter 2015." Southern recorded no estimated losses related to the Kemper Plant during that quarter.

142.    In August 2014, Mr. Wingo was placed on paid administrative leave by the Company and Mr. Wingo began recording his telephone conversations with Company officials.

143.    On September 23, 2014, Mr. Wingo through counsel sent a demand letter to the Company, claiming he blew the whistle beginning in February 2014 by "loudly and consistently point[ing] out the schedule fraud" and thereby preventing additional false financial reporting. The letter claims "[e]veryone involved with the Kemper construction knows, or should know, that Commercial Operation Date ('COD') of May 31, 2015 is not realistic."

144.    Also in September 2014, Southern filed a Securities and Exchange Commission report informing federal regulators and shareholders that its new estimated completion date for the Kemper Plant was the first half of 2016.

145.    On October 1, 2014, the U.S. Department of Energy updated its contract with the Company, requiring as conditions for the Company's continued receipt of federal funds that the Company, *inter alia*, file reports whenever delays or adverse conditions impair the Company's ability to meet its objectives, and report cost overruns to federal energy officials.

146.    On October 29, 2014, Mr. Fanning stated during an earnings conference call that there were $418 million in additional costs for the Kemper Plant project, including $310 million caused by schedule extensions.

147.    On November 6, 2014, Southern filed its quarterly 10-Q with the SEC for the third quarter 2014, where Southern stated, "During 2014, Mississippi Power further extended the scheduled in-service date for the Kemper IGCC to the first half of 2016 and revised its cost estimate to complete construction and start-up of the Kemper IGCC." Southern recorded an additional $418 million in estimated losses associated with the Kemper Plant that quarter.

148.    On February 4, 2015, the Company reported during an earnings conference call that its 2013 results included after-tax charges of $729 million related to increased cost estimates for construction of the Kemper Plant project.

149.    On March 2, 2015, Southern filed its annual 10-K with the SEC for 2014. Southern claimed the Kemper Plant's "in-service date is currently expected to occur in the first half of 2016." Southern recorded an additional $70 million in estimated losses related to the Kemper Plant for the fourth quarter 2014.

150.    Also on March 2, 2015, Southern filed its Form S-3 Registration Statement Under the Securities Act. The S-3 Registration Statement was for the purpose of issuing approximately 19 million new common shares of the Company for approximately $ 817 million dollars. Deloitte was listed by Southern as an Expert.  In addition, Deloitte filed a Consent for the inclusion of its Audit Reports and Opinions on the company's financial statements.

151.    On February 14, 2015, Mr. Wingo filed a retaliation claim with OSHA under the whistleblower provisions of Sarbanes-Oxley. In the filing, Mr. Wingo alleges "willful deception" at the Kemper Plant, including "decisions being made, shortcuts being taken, concessions being granted, issues being ignored (some that might classify as safety related-like the measly time allotted for operator training), too many to list, all in support of a schedule that many of us know to be a sham." Mr. Wingo further alleged in the filing that the Company paid millions of dollars in unnecessary expediting fees and that the Company published incorrect information regarding the Kemper Plant schedule.

152.    On February 19, 2015, Southern Company Services, a subsidiary of the Company, sued Mr. Wingo, alleging that Mr. Wingo had breached an employment termination agreement. Initially, according to New York Times interviews and court records, the Company had offered Mr. Wingo $975,000 to remain quiet. After Mr. Wingo refused, the Company filed suit against him in Jefferson County Circuit Court, alleging he had agreed to a settlement that required him to keep quiet about the Kemper Plant. The Company obtained a temporary restraining order against Mr. Wingo in February 2015 forbidding Mr. Wingo to speak publicly about Kemper Plant. Mr. Wingo denied any such agreement, and the Company eventually dropped its suit in March 2015.

153.    On March 9, 2015, the Company issued a news release saying the Kemper Plant reached "one of its most significant milestones to date," the successful first fire of the plant's

gasifiers. A "first fire" has a very specific engineering definition and should have involved the "controlled circulation of sand and/or ash inside the various parts of the gasifier." A "first fire" should have also involved, among other steps, heating the gasifier to temperatures suitable for gasification of coal, which is about 1,800 degrees Fahrenheit. (These steps did not actually occur, as described above.).

154.    On April 28, 2015, the Company issued promotional materials stating, in part, that "Mississippi Power has announced that the Kemper project is expected to begin operation in the first half of 2016."

155.    On May 7, 2015, Southern filed its quarterly 10-Q for the first quarter 2015 with the SEC. Southern stated that the "in-service date for the remainder of the Kemper IGCC is currently expected to occur int he first half of 2016." Southern recorded an additional $9 million in estimated losses associated with the Kemper Plant for that quarter.

156.    During a July 29, 2015 earnings call, Mr. Fanning assured shareholders that the unforeseen costs associated with the Kemper Plant were less than the funds that Southern had set aside for the project. Mr. Fanning stated, "To a large extent, contingencies for cost and schedule have been sufficient to absorb these activities and the focus remains on the expected end-service date in the first half of 2016."

157.    On August 5, 2015, Southern filed its quarterly Form 10-Q with the SEC for the second quarter 2015. Southern again stated that the "in-service date for the remainder of the Kemper IGCC is currently expected to occur in the first half of 2016." Southern recorded an additional $23 million in estimated losses associated with the Kemper Plant for the second quarter 2015.

158.    In September 2015, Southern announced a delay in the completion of the Kemper Plant. In a Form 8-K filed with the SEC, the Company announced that "Mississippi Power now anticipates the in-service date to occur subsequent to April 19, 2016," and that this extension would require Mississippi Power to recapture $234 million in tax credits.

159.    On September 29, 2015, the Company released a statement stating that the Kemper Plant was not expected to be operational until after April 19, 2016. Southern again claimed that "the in-service date for the remainder of the Kemper IGCC is currently expected to occur in the first half of 2016." Southern recorded an additional $150 million in estimated losses associated with the Kemper Plant for that quarter.

160.    On November 5, 2015, Southern filed its quarterly Form 10-Q with the SEC for the third quarter 2015. Southern confirmed that the "scheduled in-service date" for the Kemper Plant is the first half of 2016. Southern recorded an additional $150 million in estimated losses associated with the Kemper Plant for that quarter.

161.    On February 2, 2016, Southern filed a Form 8-K with the SEC, stating that it "currently expects that the Kemper IGCC will be placed in service during the third quarter of 2016."

162.    On February 26, 2016, Southern field its annual Form 10-K with the SEC for 2015. Southern confirmed the in-service date for the Kemper Project was August 31, 2016, and recorded an additional $183 million in estimated losses associated with the Kemper Plant for the fourth quarter 2015.

163.    On March 18, 2016, OSHA made a preliminary determination that the company violated the Sarbanes-Oxley Act when firing whistleblower Mr. Wingo in February 2016. In the March 18, 2016 preliminary determination letter sent to Southern, OSHA found "[t]here is

evidence that [Mr. Wingo] engaged in activity protected by SOX. [Mr. Wingo] reported improper financial reporting and scheduling improprieties beginning February 27, 2014." In the months to follow, the OSHA letter stated, Mr. Wingo "continued to seek redress of his concerns through the appropriate chain of command and contends his concerns were not addressed in a timely manner." Regarding Mr. Wingo's termination, OSHA stated the Company "has not offered credible evidence" that justified Mr. Wingo's dismissal, and thus found it "reasonable to believe that [Mr. Wingo's] engagement in protective activity was a contributing factor to the adverse action taken by [the Company], namely, not allowing [Mr. Wingo] back to work."

164.    On May 5, 2016, Southern filed its quarterly report on Form 10-Q with the SEC for the first quarter 2016, which included the following statements:

> The SEC is conducting a formal investigation of Southern Company and Mississippi Power concerning the estimated costs and expected in-service date of the Kemper IGCC. Southern Company and Mississippi Power believe the investigation is focused primarily on periods subsequent to 2010 and on accounting matters, disclosure controls and procedures, and internal controls over financial reporting associated with the Kemper IGCC.

165.    Southern also represented that the "in-service date for the remainder of the Kemper IGCC is currently expected to occur in the third quarter 2016." Southern recorded an additional $53 million in estimated losses associated with the Kemper Plant for the first quarter 2016.

166.    On August 8, 2016, Southern filed its quarterly report on Form 10-Q with the SEC for the second quarter 2016. Southern stated, "The in-service date for the remainder of the Kemper IGCC is currently expected to occur by October 31, 2016, which reflects a one-month extension." Southern recorded an additional $81 million in estimated losses associated with the Kemper Plant for the second quarter 2016.

167.    On October 3, 2016, Southern filed a Form 8-K with the SEC, stating that it "expects that the Kemper IGCC will be placed in service by November 30, 2016."

168.    On October 28, 2016, Southern filed a Form 8-K with the SEC, confirming that it "continues to expect that the Kemper IGCC will be placed in service by November 30, 2016."

169.    On November 4, 2016, Southern filed its quarterly report on Form 10-Q with the SEC for the third quarter 2016. Southern told its investors that the "in-service date for the remainder of the Kemper IGCC is currently expected to occur by December 31, 2016." Southern recorded an additional $88 million in estimated losses associated with the Kemper Plant for the third quarter 2016.

170.    On December 2, 2016, Southern filed a form 8-K, stating that it "now expects that the Kemper IGCC will be placed in service during January 2017."

171.    On January 31, 2017, Southern filed a form 8-K, stating that "Mississippi Power now expects that the Kemper IGCC will be placed in service in late February 2017."

172.    On January 20, 2017 a class action complaint was filed against Southern Company and certain of its and Mississippi Power's officers in the U.S. District Court for the Northern District of Georgia, Atlanta Division, by Monroe County Employees' Retirement System on behalf of all persons who purchased shares of Southern Company's common stock between April 25, 2012 and October 29, 2013. The complaint alleged that Southern Company and certain of its and Mississippi Power's officers made materially false and misleading statements regarding the Kemper IGCC in violation of certain provisions under the Securities Exchange Act of 1934, as amended. The complaint sought, among other things, compensatory damages and litigation costs and attorneys' fees.

173.    On February 22, 2017, Southern filed its annual Form 10-K for 2016 with the SEC. Southern announced a new "expected in-service date of mid-March 2017." Southern recorded an

additional $206 million in estimated losses associated with the Kemper Plant for the fourth quarter 2016.

174.    On February 27, 2017, Jean Vineyard filed a shareholder derivative lawsuit in the U.S. District Court for the Northern District of Georgia that named as defendants Southern Company, certain of its directors, certain of its officers, and certain former Mississippi Power officers. The complaint alleged that the defendants caused Southern Company to make false or misleading statements regarding the Kemper IGCC cost and schedule. Further, the complaint alleged that the defendants were unjustly enriched and caused the waste of corporate assets. The plaintiff sought to recover, on behalf of Southern Company, unspecified actual damages and, on her own behalf, attorneys' fees and costs in bringing the lawsuit.

175.    On March 16, 2017, Southern filed a Form-8K with the SEC, claiming that the "remainder of the Kemper [Plant] will be place in service by the end of April 2017."

176.    On May 1, 2017, Southern filed a Form 8-K with the SEC, claiming it "now expects the remainder of the Kemper IGCC, including both gasifiers, will be placed in service by the end of May 2017."

177.    On May 3, 2017, Southern filed its quarterly Form 10-Q for the first quarter of 2017 with the SEC. Southern reported that it "currently expects the remainder of the Kemper IGCC, including both gasifiers, will be placed in service by the end of May 2017." Southern recorded an additional $108 million in estimated losses associated with the Kemper Plant for the first quarter 2017.

178.    On June 28, 2017, Mississippi Power suspended operation and startup of the gasifier portion of the Kemper IGCC—the key technology that would have made the plant a "clean coal" plant.

179.    On August 2, 2017, Southern filed its quarterly Form 10-Q for the second quarter of 2017 with the SEC. Southern recorded an additional ***$3.12 billion*** in estimated losses associated with the Kemper Plant for the second quarter 2017.

180.    On November 1, 2017, Southern filed its quarterly Form 10-Q for the third quarter of 2017 with the SEC. Southern recorded an additional $34 million in estimated losses associated with the Kemper Plant for the third quarter 2017.

181.    On February 21, 2018, Southern filed its annual Form 10-Q for 2017 with the SEC. Southern recorded an additional $208 million in estimated losses associated with the Kemper Plant for the fourth quarter 2017.

182.    Also on February 21, 2018, Southern filed its Form S-3 Registration Statement Under the Securities Act. The S-3 Registration Statement was for the purpose of issuing approximately 20 million new common shares of the Company for approximately $904 million. Deloitte was listed by Southern as an Expert.  In addition, Deloitte filed a Consent for the inclusion of its Audit Reports and Opinions on the company's financial statements.

183.    In SEC filings for the first quarter 2018 through the fourth quarter 2019, Southern continued to trickle out additional estimated losses associated with the Kemper Plant.

184.    The Company demolished its coal gasification system in October 2021.

185.    From 2013 through 2019, Southern and Deloitte trickled out over $6.2 billion in cost overruns as estimated losses in its SEC reporting.

| Date 10-Q | Amount | By Year 10-K | Total |
|-----------|--------|--------------|-------|
| 4th Qtr 2012[45] | $78,000,000 | $78,000,000 | $78,000,000 |

---

[45] The first estimate loss of $ 78,000,000 was retroactively charged to 2012 in 2013.

| Date 10-Q | Amount | By Year 10-K | Total |
|---|---|---|---|
| 1st Qtr 2013 | $462,000,000 | | |
| 2nd Qtr 2013 | $450,000,000 | | |
| 3rd Qtr 2013 | $150,000,000 | | |
| 4th Qtr 2013 | $40,000,000 | $1,102,000,000 | $1,180,000,000 |
| 1st Qtr 2014 | $380,000,000 | | |
| 2nd Qtr 2014 | $0 | | |
| 3rd Qtr 2014 | $418,000,000 | | |
| 4th Qtr 2014 | $70,000,000 | $868,000,000 | $2,048,000,000 |
| 1st Qtr 2015 | $9,000,000 | | |
| 2nd Qtr 2015 | $23,000,000 | | |
| 3rd Qtr 2015 | $150,000,000 | | |
| 4th Qtr 2015 | $183,000,000 | $365,000,000 | $2,413,000,000 |
| 1st Qtr 2016 | $53,000,000 | | |
| 2nd Qtr 2016 | $81,000,000 | | |
| 3rd Qtr 2016 | $88,000,000 | | |
| 4th Qtr 2016 | $206,000,000 | $428,000,000 | $2,841,000,000 |
| 1st Qtr 2017 | $108,000,000 | | |
| 2nd Qtr 2017 | $3,012,000,000 | | |
| 3rd Qtr 2017 | $34,000,000 | | |
| 4th Qtr 2017 | $208,000,000 | $3,362,000,000 | $6,203,000,000 |
| 1st Qtr 2018 | $44,000,000 | | |
| 2nd Qtr 2018 | $0 | | |

| Date 10-Q | Amount | By Year 10-K | Total |
|-----------|--------|--------------|-------|
| 3rd Qtr 2018 | $1,000,000 | | |
| 4th Qtr 2018 | -$8,000,000 | $37,000,000 | $6,240,000,000 |
| 1st Qtr 2019 | $2,000,000 | | |
| 2nd Qtr 2019 | $4,000,000 | | |
| 3rd Qtr 2019 | $4,000,000 | | |
| 4th Qtr 2019 | $14,000,000 | $24,000,000 | $6,264,000,000 |

**B.      Deloitte's Responsibilities as Southern's Auditor.**

186.    Deloitte has served as Southern's outside independent auditor since 2002. As set forth below, Deloitte was responsible for auditing all Southern's financial statements in its Form-10Ks relating to the Kemper Plant, including those in the Class Period. As such, Deloitte was obligated to comply with Public Company Accounting Oversight Board ("PCAOB") auditing standards when auditing Southern's financial statements. In return, Southern has paid Deloitte tens of millions of dollars in professional fees during the class period.

1.      Deloitte's Financial Reporting and Generally Accepted Accounting Principles.

187.    Southern's annual financial statements filed with the SEC during the Class Period included the following, along with the referenced notes to those statements: (1) a Consolidated Balance Sheet, (2) a Consolidated Statement of Income and Comprehensive Income, (3) a Consolidated Statement of Cash Flows, and (4) a Consolidated Statement of Changes in Common (shareholders') Equity.

188.    The balance sheet provides a useful snapshot of the liquidity of a company and its financial stability at a particular point in time, including its assets and liabilities, equity, and capital.

189.    The income statement (sometimes referred to as a profit and loss statement ("P&L")) provides information about a company's revenues and expenses during a particular period. This type of information helps shareholders to assess historical trends and future performance and assess the likelihood of receiving adequate returns on their investments or loans.

190.    The cash flow statement details how much cash a company has at a point in time, the cash inflows and outflows that have taken place over a given period, the sources of the cash (e.g., from business operations or from outside lenders or shareholders), and the uses of the cash (e.g., to fund the company's operations, pay off financings, or make investments).

191.    Financial statements must include certain required disclosures to comply with GAAP. GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time and is the SEC's accounting standard for publicly traded companies.

192.    Compliance with GAAP enhances the credibility of the information in financial statements by making sure the information is a relevant, complete, timely, and fair representation of the economic transactions entered by publicly traded companies and helps provide shareholders with reliable information in which they can base their investment decisions.

193.    Shareholders consider various factors when making investment decisions, including whether they are likely to receive a return on their capital in the interest, dividends, or an increase in value of the investment. Shareholders largely base their decisions on the information contained within a company's financial statements. Thus, one of the fundamental objectives of financial reporting is to provide useful and accurate financial information to existing and potential shareholders, and others, in making investment decisions—including buying, selling, or holding

equity in a company.[46] A lack of credible and reliable information significantly increases the risk to shareholders. If financial statements are not prepared in accordance with GAAP, they are presumed to be inaccurate and misleading.[47]

194.    The Financial Accounting Standards Board ("FASB") issues and maintains the FASB Accounting Standards Codification ("ASC"), which organizes the thousands of GAAP pronouncements into roughly 90 topics. ASC is the current single source of GAAP.

195.    ASC 980-360 provides guidance for public utility plant abandonments and disallowance of costs associated with recently completed plants. Among other things, that provision required Deloitte to remove construction work in progress (CWIP) from the Kemper Plant as an asset.

### 2.    Regulatory Accounting.

196.    Public utilities are also required to follow Regulatory Accounting that, at times, supersedes GAAP. Regulatory Accounting requires a company to correlate the timing of revenue and expenses with the rates approved or disapproved by public service commissions.

197.    Regulatory Accounting recognizes a concept that electric utilities have only two sources of funding for operations: (1) electric rates that a utility charges to and recovers from customers; and (2) shareholder expenses (i.e., any amount a utility is not permitted to recover from its customers for any reason).

### 3.    The Independent Role of the External Auditor.

198.    A company's management is responsible for preparing the company's financial statements and required disclosures. To ensure financial statements are accurate and GAAP

---

[46] *See generally* FASB Statement of Financial Accounting Concepts No. 8 OB2, *see also* OB3-OB11.
[47] Regulation S-X (17 C.F.R. §210.4-01(a)(1)).

compliant, publicly traded companies are required to hire independent certified public accountants to audit their financial statements and provide the audited financial statements to the public.

199.   The objective of the independent audit is to provide an independent, outside opinion on the *fairness* of a company's financial statements (in all material respects), the company's financial position, the results of its operations, and its cash flows, in conformance with GAAP.[48] In essence, the independent auditor, such as Deloitte, acts as a "gatekeeper" for public securities by ensuring what the company reports is fair, accurate, and trustworthy. In this respect, an auditor protects the shareholders' interest and prevents misconduct by company management. An auditor's decisions directly impact the welfare of shareholders and thus, his independence from the audited company is critical.

200.   An auditor's report, especially one from one of the "Big Four" accounting firms like Deloitte, carries great import. It is the manner through which an auditor expresses or disclaims an opinion, and whether his audit has been made in accordance with Generally Accepted Auditing Standards (GAAP).[49] Shareholders rely on these opinions and audited financials to accurately assess pertinent information concerning the company and to make investment decisions. The auditor's report lets shareholders know whether they can rely on the audited financial statements in making investment related decisions.

201.   Independent outside auditors are required to act independently and serve as check against the managers of the company, who face various incentives to make favorable assessments and disclosures. Indeed, an auditor's independence is critical to his effectiveness as a gatekeeper. Auditors may not simply take management's word for things. An auditor must conduct an

---

[48] AS 1001.01.
[49] *Id.*

independent and impartial investigation and perform independent procedures and tests to determine whether the management has made any mistakes in its financial statements, whether intentional or inadvertent, so that the company's board of directors and shareholders are aware. Auditors must also assess whether the financial statement's form accurately reflects the substance of the economic activity.[50] For example, a statement that is technically accurate under GAAP may still be misleading or incomplete and require the auditor to provide additional explanation so that the company's activities can be appropriately understood.

202.    If the financial statements are materially correct and presented fairly in accordance with GAAP and statutory requirements, an auditor may issue an "unqualified" or "clean" report, with no exceptions. But when the financial statements materially deviate from GAAP, such as missed disclosures or inaccurately reported numbers, the auditor is required to highlight that information in his report so that shareholders and other uses of the financial statements are aware. This alerts shareholders, lenders, and other users of the financial statements that the credibility of the financial statements is in question and unreliable. An auditor's failure to highlight this information would violate his professional standards. Similarly, an auditor is required to issue a disclaimer if he is prevented from gathering enough information to properly conduct the audit.

203.    If an auditor later discovers facts that would have affected his report had he previously known those facts, he must take certain steps, including disclosing these facts and revising his report.[51] He must take affirmative steps to make sure that shareholders and others do not rely on his previous, unrevised report.[52]

---

[50] AS 2815 The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles."
[51] AS 2905 Subsequent Discovery of Facts Existing at the Date of the Auditor's Report.
[52] *Id*.

4. <u>Deloitte was obligated to follow PCAOB standards when conducting its audits of Southern's financial statements.</u>

204.    The Sarbanes-Oxley Act of 2002 directs the PCAOB to establish auditing and related professional practice standards and rules for registered public accounting firms to follow in auditing public companies ("PCAOB Standards").[53] These standards are the minimum ethical, performance, and quality standards auditors are required to meet.

205.    After its founding and prior to December 31, 2016, the PCAOB had adopted many of the auditing standards developed by the AICPA Auditing Standards Board. Standards during this time were referred to as either "AU" or "AS" and were periodically revised by PCAOB. Effective December 31, 2016, PCAOB Standards were reorganized and grouped into five categories as follows:

- General Auditing Standards—Standards on broad auditing principles, concepts, activities, and communications;

- Audit Procedures—Standards for planning and performing audit procedures and for obtaining audit evidence;

- Auditor Reporting—Standards for auditors' reports;

- Matters Relating to Filings Under Federal Securities Laws—Standards on certain auditor responsibilities relating to U.S. Securities and Exchange Commission filings for securities offerings and reviews of interim financial information; and

- Other Matters Associated with Audits—Standards for other work performed in conjunction with an audit of an issuer or of a broker or dealer.[54]

206.    The new standards are referred to as "AS." Notably, the reorganization and amendments to PCAOB Standards as of December 31, 2016, did not impose new requirements on

---

[53] https://pcaobus.org/oversight/standards, (last visited Jan. 26, 2022).
[54] PCAOB Approves Reorganization of Auditing Standard, March 31, 2015 (available at https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-approves-reorganization-of-auditing-standards-_507).

auditors or change the substance of the requirements for performing and reporting on audits under PCAOB standards.[55]

207.    As Southern's auditor, Deloitte was obligated by law and SEC regulations to follow PCAOB Standards. Under PCAOB Standards, the objective of an audit is the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations, and the cash flows, in conformity with GAAP.[56] PCAOB Standards recognize that judgment concerning the "fairness" of financial statements "should"[57] be applied within the framework of generally accepted accounting principles."[58]

208.    Accordingly, Deloitte's audit reports should have been based on its "judgment as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation;[59] (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed;[60] and (e) the financial statements reflect the underlying transactions and events in a manner that presents the

---

[55] Reorganization of PCAOB Auditing Standards and Related Amendments to PCAOB Standards and Rules, PCAOB Release No. 2015-002, March 31, 2015 (available at https://pcaobus.org/Rulemaking/Docket040/Release_2015_002_Reorganization.pdf).
[56] PCAOB AS 1001.01.
[57] The word "should" reflects that Deloitte's responsibility to comply with this requirement was "presumptively mandatory" under PCAOB Standards. To the extent that such a procedure was not performed, Deloitte was required to perform and document additional audit procedures that achieved the same result as well as document the reasons why alternative procedures met the objective of the presumptively mandatory procedure. Similarly, the words "must" or "is required" indicate an unconditional requirement. PCAOB Rule 3101, Certain Terms Used in Auditing and Related Professional Practice Standards.
[58] PCAOB AS 2815.
[59] PCAOB AS 2810; AS 2810.31.
[60] PCAOB AS 2810.31.

financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements."[61]

209.    To achieve this, Deloitte was required to plan and perform audit procedures to obtain "reasonable assurance" as to whether Southern's financial statements were free of material misstatement, whether caused of error or fraud. [62] PCAOB Standards recognize that "reasonable assurance" generally means "a high level" of assurance.[63]

> 5.   <u>Deloitte was required to exercise due professional care and professional skepticism when auditing Southern's financial statements.</u>

210.    To obtain "reasonable assurance" PCAOB Standards require an auditor to reduce audit risk to an appropriately low level though the application of due professional care.[64] The exercise of due professional care required that Deloitte use its "knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence" to support its audit.[65]

211.    Due professional care also required Deloitte exercise professional skepticism—i.e., to conduct its investigation with a questioning mind and critically assess audit evidence.[66] Accordingly, Deloitte's "responses to the assessed risks of material misstatement,[67] particularly fraud risks, should [have] involve[ed] the application of professional skepticism in gathering and evaluating audit evidence."[68]

---

[61] PCAOB AS 2815.04.
[62] PCAOB AS 1001.01; *see also* AS 2015.
[63] PCAOB AS 1015; 1015.10.
[64] PCAOB AS 1105; PCAOB AS 2301; PCAOB AS 2301.08.
[65] PCAOB AS 1015.07.
[66] PCAOB AS 1015.07-09.
[67] PCAOB AS 1101.05.
[68] PCAOB AS 2301.07.

6.   Deloitte was required to understand Southern's business and to identify and respond to red flags affecting Southern's financial statements.

212.   Deloitte was required to perform risk assessment procedures "sufficient to provide a reasonable basis for identifying and assessing" the risks of material misstatements affecting Southern's financial statements.[69] In assessing this risk, Deloitte was required to understand Southern's business, including:

- The nature of the company, including the company's organizational structure and management personnel, key personnel, key supplier and customer relationships, sources of funding of the company's operations and investment activities and other debt instruments, significant investments, joint ventures and the Company's operating characteristics, including its size and complexity;[70]

- Relevant industry, regulatory, and other external factors affecting the company, including an understanding of relevant industry, regulatory, and other external factors encompasses industry factors, including the competitive environment and technological developments; the regulatory environment, including the applicable financial reporting framework and the legal and political environment; and external factors, including general economic conditions; and[71]

- The Company's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement, including industry developments, expansion of the business, current and prospective financing requirements and regulatory requirements (including increased legal exposure).[72]

213.   This requirement included, among other things, Deloitte understanding the regulatory environment and the implications of illegal acts that would materially affect Southern's financial statements, including, for example, any misrepresentations made to regulators (such as MPSC), that could impact the financial statements and violations related to GAAP and SEC disclosure requirements.

---

[69] PCAOB AS 1101.05.
[70] PCAOB AS 2110.10.
[71] PCAOB AS 2110.09; PCAOB AS 1101; PCAOB AS 2110.09; and PCAOB AS 2301.
[72] PCAOB AS 2110.15.

214. Southern's financial statements, including the notes, made numerous representations[73] regarding the Kemper Plant, including but not limited to: (1) the expected completion of the Kemper Plant; (2) capitalized construction work in progress related to the Kemper Plant; (3) regulatory rate revisions and related pending, approved, or denied regulatory order related to the Kemper Plant; (4) anticipated tax credits; and (5) the cost in excess of the $2.88 billion dollars, that could not be recovered from the customer, and therefore borne by the shareholders.

215. Given these assertions, Deloitte was required to obtain an understanding as to these matters so that it could "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement"[74] on Southern's financial statements, including but not limited to:

- Regulatory matters affecting the Kemper Plant, including rate applications and orders and their implications for financial statement reporting, including construction cost in excess of $2.88 billion dollars that would be borne by the shareholders;

- Southern's ability to recover costs associated with the Kemper Plant though ratepayers and the factors, conditions, and requirements, that would affect rate recovery;

- Communications between Southern and its regulators, including the MPSC;

- How the construction of the Kemper Plant was to be overseen and managed from the beginning to the completion of the project. This included the project and financial reportingcontrols over the recording of contingencies, costs, measurement of project historical performance, projected project completion dates, and the filing of the

---

[73] PCAOB standards recognize that those assertions can be classified into the following categories: (1) Existence or occurrence – Assets or liabilities of the company exist at a given date, and recorded transactions have occurred during a given period, (2) Completeness – All transactions and accounts that should be presented in the financial statements are so included, (3) Valuation or allocation – Asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts, (4) Rights and obligations – The company holds or controls rights to the assets, and liabilities are obligations of the company at a given date, and (5) Presentation and disclosure – The components of the financial statements *are properly classified, described, and disclosed*. PCAOB AS § 1105.11. (emphasis added).

[74] AS 2110.07.

necessary annual rate application filings. In this respect, Deloitte should have also read the original construction contract and consider the implications of the contract with respect to Southern's financial reporting. This would have included any language related to project management, schedules, costs, claims, and changes;

- The Company's policies, processes, procedures and related internal controls for monitoring and supervising the construction of the Kemper Plant. This would include understanding: (1) significant reports from external consultants hired, as well as internal reports, issued in connection with the Kemper Plant; (ii) who was conducting the monitoring and supervision at the Kemper Plant, how often reviews occurred, what the review entailed, what qualifications such reviewers had and how were such reviews were evidenced and documented; (iii) who had approval authority and at what levels for changes in either costs and/or schedules associated with the Kemper Plant; and (iv) how Kemper Plant related claims were processed and approved, including the role of the Kemper Plant engineers, accounting, and legal departments;

- Internal audit reports related to the Kemper Plant, if any;

- The timeline for the construction and operation of the Kemper Plant, including the estimated completion date, key project milestones, deliverables, and expected costs;

- The "run rate" and percentage of completion on costs on an ongoing basis and as compared to the physical completion percentage of applicable milestones;

- Movement or changes (especially delays) in the expected (projected) completion dates, the quantified impact of delays and changes on costs, any construction claims that had been proposed/submitted, the response of the Company to those, and the new expected completion dates and costs. This would include: (i) the specific reasons for delays and the impact of those reasons on the timeline as well as on the costs, and (ii) whether or not there were any differences of opinion between those expressed by the engineers and project managers, Southern, and outside retained consultants;

- Kemper Plant management related reports and or documented summaries provided to executives evident in the Company's Board of Directors and applicable subcommittees related minutes and MPSC; and

- Tax law related to tax credits Southern expected to receive in connection with the Kemper Plant, including the requirements to obtain said tax credits, such as project deadlines.

216.     With this understanding, Deloitte was then required to assess the risk of material misstatement on both the fraudulent statements and disclosure in the footnotes to the financial statements,[75] and the assertion level.

217.     As explained above, Southern's ability to recover its investment in the Kemper Plant was subject to multiple uncertainties and risks. Of particular importance was its ability to meet its costs and schedule forecasts.

218.     As Deloitte acknowledged, "accounting for the economics of rate regulation impacts multiple financial statement line items and disclosures, including, but not limited to, property, plant, and equipment; other regulatory assets; other regulatory liabilities; other cost of removal obligations; deferred charges and credits related to income taxes; under and over recovered regulatory clause revenues; operating revenues; operations and maintenance expenses; and depreciation."[76] The MPSC "sets the rates the regulated utility subsidiaries are permitted to charge customers based on allowable costs, including a reasonable return on capital. Rates are determined and approved in regulatory proceedings based on an analysis of the applicable regulated subsidiary's costs to provide utility service and a return on, and recovery of, its investment in the utility business. As a result, current and future regulatory decisions can have an impact on the recovery of costs, the rate of return earned on investments, and the timing and

---

[75] "Risks of material misstatement at the financial statement level relate pervasively to the financial statements as a whole and potentially affect many assertions. Risks of material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud. For example, an ineffective control environment, a lack of sufficient capital to continue operations, and declining conditions affecting the company's industry might create pressures or opportunities for management to manipulate the financial statements, leading to higher risk of material misstatement." AS § 1101.06.

[76] Deloitte Audit Report, Southern, dated February 19, 2020, at 2.

amount of assets to be recovered by rates. [MPSC's] regulation of rates is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital."[77]

219.    Deloitte should have employed auditing procedures relating to the uncertainty of MSPC's future decisions that included at least the following:

- Testing the effectiveness of management's controls over the evaluation of the likelihood of (1) the recovery in future rates of costs incurred as property, plant and equipment and deferred as regulatory assets, and (2) a refund or a future reduction in rates that should be reported as regulatory liabilities, as well as the effectiveness of management's controls over the initial recognition of amounts as property, plant, and equipment; regulatory assets or liabilities; and the monitoring and evaluation of regulatory developments that may have a material effect on the financial statements and accompanying disclosures. This would include a material affect arising from the likelihood of recovering costs in future rates or of a future reduction in rates.[78]

- Reading the relevant regulatory orders issued by MPSC, regulatory statutes, interpretations, procedural memorandums, filings made by intervenors, and other publicly available information to assess the likelihood of recovery in future rates or of a future reduction in rates based on precedence of the MPSC's treatment of similar costs under similar circumstances.[79]

- Conducting a comparison of external information to management's recorded regulatory asset and liability balances for completeness.[80]

- Inspection of filings with the MPSC by both Southern and other interested parties that could impact Southern's future rates for any evidence that might contradict management's assertions.[81]

- Evaluation of regulatory filings for any evidence that intervenors are challenging full recovery of the cost of any capital projects.[82]

---

[77] *Id.*

[78] *Id. See also* PCAOB AS 2201.

[79] *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401.

[80] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

[81] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

[82] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

- Testing selected costs included in the capitalized project costs for completeness, accuracy.[83], and recoverability through rates from customers, recognizing that any amount in excess of $2.88 billion dollars would be borne by shareholders.

- Obtainment of representations from management regarding probability of recovery for regulatory assets or refund or future reduction in rates for regulatory liabilities to assess management's assertion that amounts are probable of recovery, refund, or a future reduction in rates.[84]

- Evaluation of Southern's disclosures related to the impacts of rate regulation, including the balances recorded and regulatory developments.[85]

220.    Similarly, Southern's cost and schedule forecasts were also subject to numerous uncertainties which could impact Southern's cost recover on the Kemper Plant, including:

> [C]hallenges with management of contractors and vendors; subcontractor performance; supervision of craft labor and related craft labor productivity, particularly in the installation of electrical and mechanical commodities, ability to attract and retain craft labor, and/or related cost escalation; procurement, fabrication, delivery, assembly, installation, system turnover, and the initial testing and start-up, including any required engineering changes or any remediation related thereto, of plant systems, structures, or components (some of which are based on new technology that only within the last few years began initial operation . . .) or regional transmission upgrades, any of which may require additional labor and/or materials; or other issues that could arise and change the projected schedule and estimated cost.[86]

221.    As a result, and as Deloitte also subsequently admitted in the context of a similar audit, it should have "identified as a critical audit matter the evaluation of these disclosures which involved significant audit effort requiring specialized industry and construction expertise,

---

[83] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

[84] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e*.g., PCAOB AS 2805.

[85] Deloitte Audit Report, Southern, dated February 19, 2020; *see, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110, PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405; PCAOB AS 2815.

[86] Deloitte Audit Report, Southern, dated February 19, 2020, at 4.

extensive knowledge of rate regulation, and difficult and subjective judgments."[87] Its audit procedures should have included at least the following:

- Testing of the effectiveness of internal controls over the on-going evaluation and monitoring of the construction schedule and capital cost forecast and over the disclosure of matters related to the construction and ultimate cost recovery of the Kemper Plant.[88]

- Collaboration with construction specialists to assist in Deloitte's evaluation of Southern's processes for on-going evaluation and monitoring of the construction schedule and cost forecast and to assess the disclosures of challenges to the achievement of such forecasts.[89]

- Attendance at meetings with Southern officials, project managers (including contractors), independent regulatory monitors, to evaluate and monitor construction status and identify cost and schedule challenges.[90]

- Review of reports of external independent monitors employed by MPSC to monitor the status of construction at the Kemper Plant and to evaluate the completeness of Southern's disclosure of challenges to the achievement of cost and schedule forecasts.[91]

- Inquiry of Southern's officials and project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts.[92]

- Inspection of regulatory filings and transcripts of MPSC hearings regarding the construction of the Kemper Plant to identify potential challenges to the recovery of Southern's construction costs and to evaluate the disclosures with respect to such uncertainties.[93]

---

[87] *Id.*

[88] *Id. See, e.g.*, PCAOB AS 2201.

[89] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 1210; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

[90] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301.

[91] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301.

[92] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301.

[93] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.

- Inquiry of Southern's management and internal and external legal counsel regarding any potential legal actions or issues arising from project construction or issues involving the co-owners of the project.[94]

- Comparison of the financial statement disclosures relating to this matter to the information gathered through the conduct of all Deloitte's procedures to evaluate whether there were omissions relating to significant facts or uncertainties regarding the status of construction or other factors which could impact the ultimate cost recovery of the Kemper Plant.[95]

- Obtaining representations from management regarding disclosure of all matters related to the cost and/or status, including matters related to a co-owner or regulatory development, that could result in a potential disallowance of costs related to the construction of the Kemper Plant.[96]

   7.  <u>Deloitte was responsible for obtaining sufficient appropriate evidence to afford a reasonable basis for its audit report of Southern's financial statements.</u>

222.   Deloitte was required to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis" for its audit report relating to the Kemper Project.[97]

223.   Under PCAOB Standards, auditors "should not be satisfied with less than persuasive evidence because of a belief that management is honest."[98] In developing its audit report, Deloitte should have "take[n] into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."[99]

---

[94] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.,* PCAOB AS 2401; PCAOB AS 2405; PCAOB AS 2805.
[95] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 1105; PCAOB AS 2101; PCAOB AS 2110; PCAOB AS 2301; PCAOB AS 2401; PCAOB AS 2405.
[96] Deloitte Audit Report, Southern, dated February 19, 2020, at 4. *See, e.g.*, PCAOB AS 2401; PCAOB AS 2405; PCAOB AS 2805.
[97] PCAOB AS 1105.04.
[98] PCAOB AS 1015.09.
[99] PCAOB AS 2810.03.

224.    When the auditor obtains audit evidence during the course of the audit that contradicts or is inconsistent with the audit evidence on which the auditor originally based his or her risk assessment, PCAOB Standards state that the auditor "should revise the related risk assessments and modify the planned nature, timing, or extent of substantive procedures covering the remaining period as necessary," in response to the revised risk assessments.[100] To the extent Deloitte obtained audit evidence from one source that was inconsistent with that obtained from another, or if Deloitte had doubts about the reliability of information to be used as audit evidence during its audits related to the Kemper Project, PCAOB Standards note that Deloitte "should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit."[101]

225.    PCAOB Staff Practice Alert No. 8 states:

PCAOB standards require auditors to design and perform audit procedures in a manner that addresses the assessed risks of material misstatement and to obtain more persuasive evidence the higher the assessment of risk.[] The auditor is required to apply professional skepticism, which includes a critical assessment of the audit evidence.[] Substantive procedures generally provide persuasive evidence when they are designed and performed to obtain evidence that is relevant and reliable.[] When discussing the characteristics of reliable audit evidence, PCAOB standards observe that generally, among other things, evidence obtained from a knowledgeable source independent of the company is more reliable than evidence obtained only from internal company sources and evidence obtained directly by the auditor is more reliable than evidence obtained indirectly.[] Taken together, this means that in higher risk areas, the auditor's appropriate application of professional skepticism should result in procedures that are focused on obtaining evidence that is more relevant and reliable, such as evidence obtained directly and evidence obtained from independent, knowledgeable sources.[]

---

[100] PCAOB AS 2301.11. *See also* PCAOB AS 2110.74 which states: "The auditor's assessment of the risks of material misstatement, including fraud risks, should continue throughout the audit. When the auditor obtains audit evidence during the course of the audit that contradicts the audit evidence on which the auditor originally based his or her risk assessment, the auditor should revise the risk assessment and modify planned audit procedures or perform additional procedures in response to the revised risk assessments."
[101] PCAOB AS 1105.29.

Further, if audit evidence obtained from one source is inconsistent with that obtained from another, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit.

226.    Here, Deloitte's evaluation of Southern's audit results was presumptively required to include an evaluation of several items, including the following:

- The presentation of the financial statements, including the disclosures;

- Misstatements accumulated during the audit, including, in particular, uncorrected misstatements;

- Conditions identified during the audit that relate to the assessment of the risk of material misstatement due to fraud ("fraud risk"); and

- The sufficiency and appropriateness of the audit evidence obtained.[102]

8.    <u>Deloitte was required to review Southern's quarterly statements on Forms 10-Q filed with the SEC.</u>

227.    Although Deloitte was not required to issue a written report on Southern's interim financial information, included in the 10-Q, pursuant to Rule 10-01(d) of Regulation S-X, Deloitte was required to conduct a review of the statements included in Southern's Quarterly Report on Form 10-Q prior to its filing with the SEC. Southern was also required by the SEC to engage an independent accountant to review its interim financial information, in accordance with PCOAB standards, before Southern filed its quarterly reports.[103]

228.    The objective of a review of interim financial information differs from that of an audit. The purpose of such objective reviews was to provide Deloitte with a basis for communicating to Southern's management and Audit Committee whether it was aware of any

---

[102] PCAOB AS 2810.04.
[103] PCAOB AS 4105.03.

material modifications that should be made to the interim financial information for it to conform with GAAP.[104]

229. To satisfy this objective, PCAOB Standards required that Deloitte perform certain analytical procedures and make inquiries of persons responsible for financial and accounting matters.[105] To the extent Deloitte became aware of information that led it to conclude that the interim financial information may not be presented in accordance with GAAP, it was required tomake additional inquiries or perform other procedures to provide a basis for communicating whether it is aware of any material modifications that should be made to the interim financial information.[106] Deloitte was required to communicate its finding in writing to the Audit Committee of Southern. If those findings were adverse to what was disclosed in the Form 10-Q and Southern refused to correct the material misstatements to make them not misleading, Deloitte would have been required to resign as Southern's External Auditor.

### C. Deloitte's audits of Southern's 10-Ks were "no audits at all."

230. Prior to and throughout the class period, Southern filed its annual reports on Forms 10-K, spanning the years ending on December 31, 2012-December 31, 2020.

231. Deloitte issued unqualified "clean" audit reports on these financial statements, in which Deloitte represented that it had audited the consolidated balance sheets of Southern and its subsidiary companies (collectively referred to by Deloitte as "Southern" or "the Company"), and the related consolidated statements of income, comprehensive income, stockholders' equity, and

---

[104] PCAOB AS 4105.07.
[105] *Id.*
[106] PCAOB AS 4105.22.

cash flows for each of the three years indicated in each audit and the related notes (collectively referred to by Deloitte as the "financial statements").

232.    Deloitte claimed that it had audited these financial statements "in accordance with the standards of the PCAOB . . . to obtain a reasonable assurance about whether the financial statements are free of material misstatement, whether due to error of fraud, and whether effective internal control over financial reporting was maintained in all material respects." Deloitte represented that its audits provided "a reasonable basis" for its opinions on Southern's financial statements.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

233.    Deloitte concluded that, in its opinion, the consolidated financial statements "present[ed] fairly, in all material respects, the financial position of Southern and Subsidiary Companies. . . and the results of their operations and their cash flows for each of the three years in the [reporting] period. . . in conformity with accounting principles generally accepted in the United States of America."[107]

---

[107] *See, e.g.*, 2012 Form 10-K at II-10; 2013 Form 10-K at II-10; 2014 Form 10-K at II-9; 2015 Form 10-K at II-9; 2016 Form 10-K at II-9; 2017 Form 10-K at II-9; 2018 Form 10-K at II-216; 2019 Form 10-K at II-124.

234.    Deloitte also specifically stated that it had "audited Southern's internal control over financial reporting" based on criteria established in Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Deloitte acknowledged that:

> A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

235.    Deloitte stated that in its opinion, "the Company maintained, in all material respects, effective internal control over financial reporting . . . based on the criteria established in Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

236.    These statements were false and misleading because Deloitte did not conduct its audit in accordance with the PCAOB standards (described above). Specifically, Deloitte either intentionally or recklessly failed to obtain sufficient audit evidence to provide reasonable assurance that (1) the Kemper Plant would be completed within the time and budget estimates provided by Southern (to the contrary, evidence available to Deloitte showed that these deadlines were not realistic and not made in good faith); (2) the losses incurred in connection with the Kemper Plant were properly estimated and recorded as losses at the time they were reasonably

estimable (to the contrary, Deloitte permitted Southern to incrementally recognize $6.2 billion in losses related to the Kemper Plant for 26 quarters all borne by the shareholders of the company); and (3) Southern could properly claim billions of dollars in construction work in progress as an asset on its balance sheets (to the contrary, there was sufficient evidence that these costs could never be passed onto the ratepayers, and therefore would be borne by the shareholders, due to the project delays, cost overruns, and ultimate failure of the project, and therefore, claiming these costs as assets violated ASC 98-360).

237.    Deloitte had access to evidence disproving the above, as Southern had also engaged Deloitte specifically to audit and review Kemper Plant costs. This engagement provided Deloitte with, among other things, historical day-to-day performance information, internal memoranda, expert and consultant materials, monthly reports and other information indicating the project was in jeopardy.

238.    Mississippi Power's Comptroller, Cynthia Shaw, testified before the MPSC in a 2015 prudency hearing that the Company had engaged Deloitte to audit and review Kemper Plant costs from various perspectives and differing auditing objectives. She also testified that Mississippi Power's accounting and cost tracking procedures complied with GAAP and were subject to the Southern's internal controls framework for financial reporting—which were audited by Deloitte.

239.    Ms. Shaw testified, "[i]n accordance with GAAP, probable losses that can be estimated must be charged against its earnings. Accounting Standards Codification (ASC) 450-20-25-2 explains the criteria for accrual and disclosure as shown below:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a. Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25 indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent

accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.

240.    She testified the that the costs associated with the Kemper Plant were appropriately recorded and that Deloitte had audited or reviewed Kemper Plant project costs and that the actual expenditures associated with the Kemper Plant were fairly stated.

241.    Given Deloitte's position as, not only Southern's independent auditor for its SEC filings, but as the auditor for Kemper Plant costs specifically, Deloitte had access to evidence that would have clearly negated the costs and budget estimates Southern provided its shareholders, the total estimable losses incurred in connection with the Kemper Plant and timing of recognition of these losses borne by the shareholders of the company, and Southern's inability to claim work in progress on the Kemper Plant as an asset, in accordance with ASC 98-360. Such evidence included, but was not limited to, key communication and project management and status reports, planning documents, budget estimates, key deliverables, interviews with project managers and engineers, the Independent Monitor's reports, orders and communications between Southern and its regulators, capital expenditure summaries, and communication with the Company's board of directors and key figures associated with the Kemper Project, and other evidence.

242.    These statements were also materially false and misleading when made because Deloitte recklessly or intentionally ignored numerous red flags indicating that Southern's annual report and financial statements were materially misstated and omitted material information regarding the status of the Kemper Plant, the true nature and sum of the losses associated with the Kemper Plant, and Southern's ability to recover any portion of these losses from the ratepayers.

243.    These statements were also materially false and misleading when made because Southern did not maintain effective internal control over financial reporting and Deloitte failed to properly assess the risk that a material weakness existed in Southern's financial reporting as a result. Deloitte knew, or should have known, that significant inconsistencies existed between the Kemper Plant related accounting in Southern's financial statements and the disclosures and other information Deloitte obtained concerning the Kemper Plant's costs and schedule. These inconsistencies revealed that Southern's internal controls were not properly designed or operating effectively—or that they were being ignored by Southern altogether.

244.    The Sarbanes-Oxley Act of 2002 ("SOX") required Deloitte to audit and express an opinion on the effectiveness of Southern's internal control over financial reporting in order to bring information about any material weaknesses to public view.[108] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility[109] that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[110]

---

[108] SEC Release No. 33-8810, *see* II.B.3, at 38.

[109] There is a "reasonable possibility" of an event, as used in this standard, when the likelihood of the event is either "reasonably possible" or "probable," as those terms are used in ASC 450, Accounting for Contingencies. PCAOB AS 2201.A7.

[110] PCAOB 2201.A7 "An internal control over financial reporting deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A deficiency in internal control over financial reporting may pertain to either a deficiency in design or operation. As set forth under PCAOB AS 2201.A3, a design deficiency "exists when "(a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met." An operating deficiency "exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively."

245.    Deloitte's report on internal controls failed to report the fact that Southern consistently failed to properly estimate and timely disclose $6.2 billion of cost overruns ultimately incurred as a failure to meet COD. This $6.2 billion was ultimately born by Southern's shareholders.

246.    Because a company's internal controls cannot be considered effective if one or more material weaknesses exist, to form a basis for its report, Deloitte was required to obtain sufficient evidence to determine with reasonable assurance whether any material weaknesses existed as of the dates of its audits. This assessment "underlies the entire audit process," and should include a "determination of significant accounts and disclosures and relevant assertions, the selection of controls to test, and the determination of the evidence necessary for a given controls.[111]

247.    A direct relationship exists between the degree of risk that a material weakness could exist and the amount of audit attention that should be devoted to that area. As the risk associated with the internal control increases, the evidence the auditor must obtain also increases. If deviations from a company's asserted controls exist, the auditor is required to "determine the effect of the deviations on his or her assessment of the risk associated with the control being tested and the evidence to be obtained, as well as on the operating effectiveness of the control."[112]

248.    Because contradictory information was evident, as discussed above, Deloitte was required to consider whether the inconsistencies indicated that Southern's internal controls, such as management's monitoring and supervision of the work in progress and construction of the Kemper Plant (including scheduling and cost overruns), Southern's evaluation of its ability to recover losses associated with the Kemper Plant through its ratepayers, Southern's monitoring

---

[111] PCAOB AS 2201.03; PCAOB AS 2201.10.
[112] PCAOB AS 2201.11; PCAOB AS 2201.46; PCAOB AS 2201.48.

regulatory developments that might impact its cost recovery and other liabilities, Southern's its disclosure controls related to the Kemper Plant, were deficient.

249.    Because Deloitte knew (or should have known) that these areas were deficient, PCAOB Standards also required that Deloitte evaluate the severity of each control deficiency that came to its attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of management's assessment.[113]

250.    Accordingly, Deloitte's clean audit reports on Southern's internal control over financing reporting were intentionally or knowingly and recklessly false and misleading when made.

**D.    Deloitte failed to take required action concerning material misstatements in Southern's 10-Qs.**

251.    Prior to and throughout the class period, Southern filed its quarterly reports on Forms 10-Q, spanning the years ending on December 31, 2012-December 31, 2020.

252.    Pursuant to Rule 10-01(d) of Regulation S-X, Deloitte was required to conduct a review of Southern's interim financial statements included in its Quarterly Report on Form 10-Q prior to its filing with the SEC during the Class Period.[114] PCAOB Standard AS 4105[115]

---

[113] PCAOB AS 2201.62.

[114] SEC Regulation S-X, Rule 10-01(d) - "Interim review by independent public accountant. Priorto filing, interim financial statements included in quarterly reports on Form 10-Q (17 CFR 249.308(a)) must be reviewed by an independent public accountant using applicable professionalstandards and procedures for conducting such reviews, as may be modified or supplemented by the Commission. If, in any filing, the company states that interim financial statements have beenreviewed by an independent public accountant, a report of the accountant on the review must befiled with the interim financial statements."

[115] "The Securities and Exchange Commission (SEC) requires a registrant to engage an independent accountant to review the registrant's interim financial information, in accordance with this section, before the registrant files its quarterly report on Form 10-Q or Form 10-QSB. The SEC also requires management, with the participation of the principal executive and financial officers (the certifying officers) to make certain quarterly and annual certifications with respect to the company's internal control over financial reporting."

recognizes that the objective of a review of interim financial information is to provide the accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. A review consists principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters.[116] A review should bring to the accountant's attention significant matters affecting the interim financial information.

253.    In performing its review of Southern's interim financial information, Deloitte became (or should have become) aware of information that led it believe that Southern's interim financial information was not in conformity with GAAP. As such, Deloitte was required to make additional inquiries or perform other procedures necessary to provide a basis for its communication as to whether any material modifications to the Southern's interim financial information were required. These additional procedures would have revealed that material modifications to the interim financial information were needed to confirm with GAAP and Deloitte should have communicated that to Southern's management and the Audit Committee. Had the management and audit committee not responded appropriately within a reasonable time, Deloitte was required to evaluate whether it should resign as Deloitte's auditor.[117]

254.    In addition to understanding Southern's processes, internal control and ongoing reporting related to the Kemper Plant, Deloitte did (or should) have had access to other critical information such as, project management reports, risk management reports, projected and actual budgeting comparisons, reports from the Independent Monitor, and other documents reflecting

---

[116] *Id.*
[117] PCAOB AS 4105.29-.31

that Southern would not only fail to meet its May 2014 COD, but would incur a $6.2 billion in cost overruns associated with the Kemper Plant that would be borne by its shareholders.

255.    In violation of PCAOB Standards, Deloitte either failed to consider whether such information was materially inconsistent with Southern's interim financial disclosures, failed to communicate that the information was materially inconsistent with Southern's interim financial disclosures, or failed to resign as Deloitte's auditor. Nor did Deloitte notify the SEC or Southern's shareholders that the Company's interim financial statements filed on Forms 10-Q did not comply with GAAP, as it was required to do.

256.    Finally, in violation of PCAOB,[118] Deloitte failed to appropriately respond to the inconsistences identified above in Southern's annual and quarterly reports. It did not disclose this information, notify the SEC, or take any other action and continued to serve as Southern's auditor.

**E.    Deloitte revealed relevant auditing procedures to the investing public for the first time in February 2020.**

257.    Deloitte's fraud was not discoverable until recently. In February 2020, facts relating to Deloitte's fraud became public thanks in part to new accounting procedures established by the PCAOB concerning Critical Audit Matters. A Critical Audit Matter ("CAM") is any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that:

- Relates to accounts or disclosures that are material to the financial statements; and

- Involved especially challenging, subjective, or complex auditor judgment.

Ex. A. *See also* PCAOB AS 3101, *The Auditor's Report on Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion.*

---

[118] PCAOB AS 2201.

258.    Auditors were previously required to determine whether there were any CAMs when auditing financial statements and communicate those CAMs to the companies' auditing committees. However, the new PCAOB procedures required auditors to communicate CAMs in their auditor reports. *See* Ex. A at 2. For each CAM communicated in an auditor's report, the auditor was required to:

- Identify the CAM;

- Describe the principal considerations that led the auditor to determine that the matter is a CAM;

- Describe how the CAM was addressed in the audit; and

- Refer to the relevant financial statement accounts or disclosures that relate to the CAM.

*Id.*

259.    To be clear, the new PCAOB mandate requiring auditors to disclose CAMs in their reports was in substance, the same as the required audit committee communications applicable to Deloitte during its pre-2019 audits of Southern's SEC reports.[119]

260.    The new CAM disclosure requirement was first effective during Deloitte's audit of Southern's fiscal year 2019 annual report. In its 2019 auditor's report dated February 23, 2020, Deloitte disclosed for the very first time how it addressed critical audit matters relating to the construction of major power plants, when it explained its evaluation of CAMs at another Southern energy construction project, the Vogtle Nuclear Project expansion in Georgia for Southern's subsidiary Georgia Power. The Vogtle Project was ongoing during the same time frame as the Kemper Plant.

---

[119] *See generally* PCAOB AS 1301.

261.     Specifically, Deloitte identified that the ultimate recovery of Georgia Power's investment in the construction of Plant Vogtle Units 3 and 4 was subject to multiple uncertainties.

> As discussed in Note 2 to the financial statements, the ultimate recovery of Georgia Power Company's (Georgia Power) investment in the construction of Plant Vogtle Units 3 and 4 is subject to multiple uncertainties. Such uncertainties include the potential impact of future decisions by Georgia Power's regulators (particularly the Georgia Public Service Commission), actions by the co-owners of the Vogtle project, and litigation or other legal proceedings involving the project. In addition, Georgia Power's ability to meet its cost and schedule forecasts could impact its capacity to fully recover its investment in the project. While the project is not subject to a cost cap, Georgia Power's cost and schedule forecasts are subject to numerous uncertainties which could impact cost recovery, including challenges with management of contractors and vendors; subcontractor performance; supervision of craft labor and related craft labor productivity, particularly in the installation of electrical, mechanical, and instrumentation and controls commodities, ability to attract and retain craft labor, and/or related cost escalation; procurement, fabrication, delivery, assembly, installation, system turnover, and the initial testing and start-up, including any required engineering changes or any remediation related thereto, of plant systems, structures, or components (some of which are based on new technology that only within the last few years began initial operation in the global nuclear industry at this scale), any of which may require additional labor and/or materials; or other issues that could arise and change the projected schedule and estimated cost. In addition, the continuing effects of the COVID-19 pandemic could further disrupt or delay construction, testing, supervisory, and support activities at Plant Vogtle Units 3 and 4. The ultimate recovery of Georgia Power's investment in Plant Vogtle Units 3 and 4 is subject to the outcome of future assessments by management as well as Georgia Public Service Commission decisions in future regulatory proceedings.

> Management has recorded charges to income, including a total of $325 million in 2020, when it has determined that it is likely to incur costs for which it will not seek recovery or which it has concluded are probable of disallowance for ratemaking purposes. In addition, management has disclosed the status, risks, and uncertainties associated with Plant Vogtle Units 3 and 4, including (1) the status of construction; (2) the status of regulatory proceedings; (3) the status of legal actions or issues involving the co-owners of the project; and (4) other matters which could impact the ultimate recoverability of Georgia Power's investment in the project. We identified as a critical audit matter the evaluation of Georgia Power's identification and disclosure of events and uncertainties that could impact the ultimate cost recovery of its investment in the construction of Plant Vogtle Units 3 and 4. This critical audit matter involved significant audit effort requiring specialized industry and construction expertise, extensive knowledge of rate regulation, and difficult and subjective judgments.

262.     Deloitte told Southern's shareholders the steps it had taken to address the CAM during its audit:

- We tested the effectiveness of internal controls over the on-going evaluation, monitoring, and disclosure of matters related to the construction and ultimate cost recovery of Plant Vogtle Units 3 and 4.

- We involved construction specialists to assist in our evaluation of Georgia Power's processes for on-going evaluation and monitoring of the construction schedule and to assess the disclosures of the uncertainties impacting the ultimate cost recovery of its investment in the construction of Plant Vogtle Units 3 and 4.

- We attended meetings with Georgia Power and Southern officials, project managers (including contractors), independent regulatory monitors, and co-owners of the project to evaluate and monitor construction status and identify cost and schedule challenges.

- We read reports of external independent monitors employed by the Georgia Public Service Commission to monitor the status of construction at Plant Vogtle Units 3 and 4 to evaluate the completeness of Georgia Power's disclosure of the uncertainties impacting the ultimate cost recovery of its investment in the construction of Plant Vogtle Units 3 and 4.

- We inquired of Georgia Power and Southern officials and project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts.

- We inspected regulatory filings and transcripts of Georgia Public Service Commission hearings regarding the construction of Plant Vogtle Units 3 and 4 to identify potential challenges to the recovery of Georgia Power's construction costs and to evaluate the disclosures with respect to such uncertainties.

- We inquired of Georgia Power and Southern management and internal and external legal counsel regarding any potential legal actions or issues arising from project construction or issues involving the co-owners of the project.

- We monitored the status of reviews by the Nuclear Regulatory Commission to identify potential impediments to the licensing and commercial operation of the project.

- We compared the financial statement disclosures relating to this matter to the information gathered through the conduct of all our procedures to evaluate whether there were omissions relating to significant facts or uncertainties regarding the status of construction or other factors which could impact the ultimate cost recovery of Plant Vogtle Units 3 and 4.

- We obtained representation from management regarding disclosure of all matters related to the cost and/or status of the construction of Plant Vogtle Units 3 and 4, including matters related to a co-owner or regulatory development, that could impact the recovery of the related costs.

263.    For the first time, shareholders were privy to what Deloitte's own assessment of what they were required to do to address critical audit matters relating to cost recovery associated with large power plants under construction such as the Kemper Plant and Plant Vogtle projects. Deloitte's self-described requirements for conducting CAMs would cause Deloitte to know if Southern's internal controls necessary to ensure the Kemper Plant was completed on time and within budget were inadequate. Southern's internal controls were woefully inaccurate, and Deloitte knew it, and Deloitte knew that Southern was falsely minimizing the losses and falsely overstating its construction progress on the Kemper Project. Yet Deloitte, without qualifying its audit reports and without reporting Southern's lack of internal control, dribbled out these inaccuracies over 26 quarters, instead of giving investors accurate information about the extent of the problems so they could make informed decisions regarding Southern stock. For example, Southern's financial statements, that Deloitte audited, recorded over $462 million in losses in a quarter, followed 90 days later by another $450 million loss to shareholders. After 18 quarters of disingenuously spreading out nearly $3 billion dollars in losses, Southern was sued by certain shareholders for its deceptive statements and omissions regarding the Kemper Plant. Only then did Southern and Deloitte report the bulk of Southern's remaining known losses—over $3.2 billion dollars—from the Kemper Plant.

### F.    Deloitte's false and misleading statements and omissions resulted in "no audit at all."

264.    Deloitte audited Southern's financial statements included in the annual report on Form 10-K for the class period years.

265.    Deloitte issued an unqualified audit report on Southern's financial statements included in the Form 10-K. In it, Deloitte represented that (1) it had performed its audit of the financial statements "in accordance with the standards of the Public Company Accounting Oversight Board"; (2) it had planned and performed its audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; and (3) its audit provided a "reasonable basis" for its reports. Deloitte further stated that Southern's financial statements "present fairly, in all material respects, the financial position" of Southern "in conformity with accounting principles generally accepted in the United States of America. Specifically, Deloitte stated the following:

> We have audited the accompanying consolidated balance sheets of Southern and subsidiaries (the "Company") as of December 31, 2019 and 2018 [and 2017 and 2016 and 2015 and 2014 and 2013] . . .

> Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

266.     These statements were materially false and misleading when made because Deloitte did not conduct its audit in accordance with the standards of the PCAOB (Section IV.B., *supra*). Specifically, Deloitte failed to obtain persuasive and sufficient evidence to provide reasonable assurance that the Kemper Project would be in service by a date certain and that Southern would receive the Projected Tax Credits and other funds tied to the COD—to the contrary, Deloitte obtained significant, material evidence that the Kemper Project would not be in service on time in order to obtain the Tax Credits and other funding.

267.     Even after the May 2014 COD came and went, and Deloitte knew that Southern would incur substantial losses because it failed to meet the COD, Deloitte continued to issue the same clean audits (and make the same false and misleading statements above) and hide the true nature of the extent of those losses by permitting Southern to improperly leak those losses out over 26 quarters.

## V.     SAFE HARBOR

268.     To the extent any statutory safe harbor could possibly apply to auditors, Deloitte knew that at the time each of the statements were made, the statements were false and misleading concerning the schedule and costs of the Kemper Project.

## VI.     PRESUMPTION OF RELIANCE

269.     Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

270.     Lead Plaintiff and the Class are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

a.     Southern's common stock was actively traded in an efficient market on the New

York Stock Exchange, a highly efficient and liquid market;

b.  Southern's common stock traded at high weekly volumes;

c.  As a regulated issuer, Southern filed periodic public reports with the SEC;

d.  Southern was eligible to file registration statements with the SEC on Form S-3;

e.  Southern regularly communicated with public shareholders by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

f.  The market reacted promptly to public information disseminated by Southern;

g.  Southern securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

h.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Southern securities; and

i.  Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Southern securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

271.   Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Southern's securities and are entitled to

a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## VII.    CLASS ACTION ALLEGATIONS

272.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased, acquired, or otherwise held Southern publicly traded securities from May 10, 2013 through February 20, 2020, inclusive, and who were damaged thereby. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Southern and Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants or Southern officers or directors have or had a controlling interest, Southern's employee retirement and benefit plan(s), and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

273.    By virtue of their positions, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

274.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Southern's outside independent auditor throughout the Class Period, and having audited costs on the Kemper Plant,

Defendants had knowledge of the details of Southern's internal affairs and progress regarding the Kemper Plant. Deloitte knew, or was reckless in not knowing, that Southern's reported annual financial results for the fiscal years which were disseminated to the investing public, were not presented in accordance with GAAP; and that the audits they conducted were not performed in accordance with PCAOB Standards and, therefore, each of Deloitte's unqualified audit reports during the Class Period were materially false and misleading. As described above, Deloitte failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

275.    All quarterly, annual filings, and registration statements filed on Form S-3 by Southern with the SEC (on which the public relies) during the Class Period contained material misstatements and omissions. Deloitte, Southern's outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or to take reasonable actions to correct them. Had Deloitte not violated PCAOB Standards, it would have detected the fraudulent valuations and material misstatements in Southern's financial statements during the Class Period.

276.    As a result of Deloitte's clean reports of Southern's misstated financial reports and Deloitte's own false and misleading statements and omissions in its unqualified audit reports, the market price of Southern's securities were artificially inflated throughout the Class Period.

277.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Southern's securities. Lead Plaintiff and the other members of the Class would not have purchased Southern securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

278.    By virtue of the foregoing, Deloitte violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 17(a)(1)-(3) of the Securities Act.

279.    For the reasons set forth herein, Deloitte is liable in whole or in part for the damages suffered by Lead Plaintiff and to Section 10(b) and Section 17(a)(1)-(3) Class members.

## VIII.   CAUSES OF ACTION

### Count One
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5

280.    Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

281.    During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282.    Defendants violated 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.    Employed devices, schemes, and artifices to defraud;

    b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Southern securities during the class period.

283.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially

false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

284.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Southern's outside independent auditor throughout the Class Period, Defendants had knowledge of the details of Southern's internal affairs. Deloitte knew, or was reckless in not knowing, that Southern's reported annual and quarterly financial results for the fiscal years ended December 31, 2013 through December 31, 2019, which were disseminated to the investing public, were not presented in accordance with GAAP; and that the audits they conducted were not performed in accordance with PCAOB Standards and, therefore, each of Deloitte's unqualified audit reports during the Class Period were materially false and misleading. As described above, Deloitte failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

285.    All quarterly and annual filings by Southern with the SEC (on which the public relies) during the Class Period contained material misstatements and omissions. Deloitte, Southern's outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or to take reasonable actions to correct them. Had Deloitte not violated PCAOB Standards, it would have detected the fraudulent valuations and material misstatements in Southern's financial statements during the Class Period.

286.    As a result of Deloitte's clean reports of Southern's misstated financial reports and Deloitte's own false and misleading statements and omissions in its unqualified audit reports, the market price of Southern's securities were artificially inflated throughout the Class Period.

287.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market and on Deloitte, they paid artificially inflated prices for Southern securities. Lead Plaintiff and the other members of the Class would not have purchased Southern securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

288.    By virtue of the foregoing, Deloitte violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

289.    For the reasons set forth herein, Deloitte is liable in whole or in part for the damages suffered by Lead Plaintiff and to Section 10(b) Class members.

**Count Two**
**For Violation of Section 17(a) of the Securities Act**

290.    Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

291.    By the conduct described above, Deloitte, directly or indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails (a) knowingly or with sever recklessness employed devices, schemes, or articles to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in such transactions, practices, or courses of business which operated by fraud or deceit upon the purchaser.

292.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market and on Deloitte, they paid artificially inflated prices for

Southern securities. Lead Plaintiff and the other members of the Class would not have purchased Southern securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

293. By virtue of the foregoing, Deloitte violated Section 17(a) of the Exchange Act.

294. For the reasons set forth herein, Deloitte is liable in whole or in part for the damages suffered by Lead Plaintiff and Class members.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a. Declaring that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

c. Awarding Lead Plaintiff and the other members of the Class their reasonable costs, and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Awarding such equitable/injunctive or other relief as the Court man deem just and proper.

## X.   **JURY DEMAND.**

Plaintiff hereby demands a trial by jury.

Dated: February 17, 2022   GORDON BALL, LLC

        By: */s/Gordon Ball*
        Gordon Ball, Esq. (TN Bar #001135)
         *Pro Hac Vice* to be filed
        gball@gordonball.com
        3728 West End Avenue
        Nashville, Tennessee 37205
        Tel: (865) 525-7028

        *Lead Counsel for Plaintiff*


        Bienert Katzman Littrell Williams LLP

        */s/Thomas H. Bienert, Jr.*
        Thomas H. Bienert, Jr. (CA Bar #135311)
         *Pro Hac Vice* to be filed
        Alexis Federico (CA Bar #313392)
         *Pro Hac Vice* to be filed
        903 Calle Amanecer, Suite 350
        San Clemente, CA 92673
        949-369-3700
        tbienert@bklwlaw.com


        Warren & Griffin, PC

        */s/ C. Mark Warren*
        C. Mark Warren (GA Bar 738210)
        cmark@warrenandgirffin.com
        John McCown (GA Bar 486002)
        john.mccown@warrenandgriffin.com
        300 West Emery, Suite 108
        Dalton, GA  30720
        706-529-4878

        *Local Counsel for Plaintiff*