**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ROBERT (BOB) FORMBY, on
behalf of himself and all others
similarly situated,

        Plaintiff,

vs.

DELOITTE & TOUCHE, LLP and
DELOITTE, LLP,

        Defendants.

No. 1:22-cv-670-WMR

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated: October 14, 2022

> Gordon Ball, Esq.
> *Admitted Pro Hac Vice*
> gball@gordonball.com
> **GORDON BALL, LLC**
> 3728 West End Avenue
> Nashville, Tennessee 37205
> Tel: (865) 525-7028
>
> *Counsel for Plaintiff*
>
> Thomas H. Bienert, Jr.
> tbienert@bklwlaw.com
> *Admitted Pro Hac Vice*
> Alexis Federico
> afederico@bklwlaw.com
> *Admitted Pro Hac Vice*
> **BIENERT, KATZMAN, LITTRELL, WILLIAMS LLP**

903 Calle Amanecer, Suite 350
San Clemente, CA 92673
949-369-3700

*Counsel for Plaintiff*

C. Mark Warren (GA Bar No. 738210)
cmark@warrenandgriffin.com
John McCown (GA Bar No. 486002)
john.mccown@warrenandgriffin.com
**WARREN & GRIFFIN, PC**
300 West Emery, Suite 108
Dalton, GA 30720
706-529-4878

*Local Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.   Introduction and Summary of the Fraud ...................................................1

II.  Argument.....................................................................................3

   A.   Plaintiff's 10(b) Claim is not Barred by the Statute of Limitations...........3

        1.   Applicable Law...................................................................3

        2.   The Limitations Period for Claims Against Deloitte Began Running
             in February 2020................................................................4

   B.   Plaintiff's 10(b) Claim is not Barred by the Statute of Repose.................7

   C.   Plaintiff's Complaint Adequately Alleges Scienter ...........................9

        1.   Applicable Law...................................................................9

        2.   The Allegations in the Complaint Give Rise to a Strong Inference
             that Deloitte Acted with Scienter.............................................10

   D.   Plaintiff Has Alleged the Falsity of Deloitte's Opinions with the
        Requisite Specificity.............................................................20

   E.   Plaintiff's Complaint Adequately Alleges Loss Causation.......................23

   F.   Deloitte LLP is a Proper Defendant ...........................................25

III. Conclusion..................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*100079 Canada, Inc. v. Stiefel Lab'ys, Inc.*,
2011 WL 13116079 (S.D. Fla. Nov. 30, 2011) ....................................................6

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)...............................................................................21

*Aronson v. Advanced Cell Tech., Inc.*,
902 F. Supp. 2d 106 (D. Mass. 2012)..................................................................8

*Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015) .......................................................................11

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
198 L. Ed. 2d 584, 137 S. Ct. 2042 (2017)..........................................................7

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ..............................................................................4

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
806 F. Supp. 2d 1267 (N.D. Ga. 2011)..............................................................24

*Cosby v. KPMG, LLP*,
2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018)....................................................17

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999)...................................................................21

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
594 F.3d 783 (11th Cir. 2010) .........................................................................10

*Health Ins. Innovations Sec. Litig.*,
2019 WL 3940842 (M.D. Fla. June 28, 2019) ....................................................18

*In re Allied Capital Corp. Sec. Litig.*,
2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ....................................................21

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
No. 07-61542-CIV, 2010 WL 6397500 (S.D. Fla. Aug. 18, 2010).....................24

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010)...............................................................7

ii

*In re Beacon Assocs. Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ................................................................8

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
  510 F. Supp. 2d 1187 (N.D. Ga. 2007) .....................................................23

*In re Dynex Capital, Inc., Sec. Litig.*,
  2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..............................................7

*In re Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012) ............................................... 23, 24

*In re First Merchants Acceptance Corp. Sec. Litig.*,
  1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ................................................17

*In re Health Mgmt., Inc. Sec. Litig.*,
  970 F. Supp. 192 (E.D.N.Y. 1997) ...........................................................17

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009) ...............................................................9

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................ 12, 17

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) .......................................................25

*In re: Petrobras Sec. Litig.*,
  2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) ............................................20

*Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*,
  128 F. Supp. 3d 792 (S.D.N.Y. 2015) .........................................................8

*La Grasta v. First Union Securities, Inc.*,
  358 F.3d 840 (11th Cir. 2004) ....................................................................4

*Marks v. CDW Computer Centers, Inc.*,
  122 F.3d 363 (7th Cir. 1997) ......................................................................4

*McCullough v. Advest, Inc.*,
  2017 WL 3675787 (W.D. Pa. Aug. 25, 2017) .............................................7

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ....................................................................................3

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ................................................................23

*Shepard v. Philip Morris, Inc.*,
  1998 WL 34064515 (M.D. Fla. Apr. 28, 1998) ...........................................8

iii

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019) ..................................................................8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) .......................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...........................................................................................10

*Vassilatos v. Ceram Tech Int'l, Ltd.*,
  1993 WL 177780 (S.D.N.Y. May 19, 1993) .......................................................7

*Wiedis v. Dreambuilder Invs., LLC*,
  268 F. Supp. 3d 457 (S.D.N.Y. 2017) .................................................................8

*Winters v. Stemberg*,
  529 F. Supp. 2d 237 (D. Mass. 2008)..................................................................8

## Statutes

28 U.S.C. § 1658(b)(2)......................................................................................7, 9

## Rules

Fed. R. Civ. P. 23(a)(3)..........................................................................................9

## Regulations

17 C.F.R. pts. 210, 240 .........................................................................................1

65 Fed. Reg. 43147, 43150 ....................................................................................1

iv

## I.    Introduction and Summary of the Fraud

"The federal securities laws . . . make independent auditors 'gatekeepers' to the public securities markets." Revision of the Commission's Auditor Independence Requirements, Exchange Act Release No. 33–7870, 65 Fed. Reg. 43147, 43150 (July 12, 2000) (codified at 17 C.F.R. pts. 210, 240).

This action seeks redress on behalf of aggrieved investors in Southern Company ("Southern") against Deloitte, Southern's independent auditor. Deloitte abdicated its responsibility as a gatekeeper by deceiving investors regarding Southern's accounting for and projected completion of a "clean coal" power plant called the Kemper Plant.

Southern is a publicly traded gas and electric utility company that serves customers across the Southeastern United States. Compl. ¶ 32. In December 2006, Southern announced a plan to construct the Kemper Plant, the first "clean coal" plant in Mississippi, which was supposed to reinvigorate the coal industry and provide much needed employment opportunities to Mississippians. *Id*. ¶ 7.

As Southern's independent auditor and the auditor of the costs of the Kemper Plant itself, *id*. ¶¶ 15, 30, Deloitte understood that it was critical to Southern investors for the Kemper Plant to achieve a commercial operation date ("COD") no later than May 2014 at a cost not exceeding $2.88 billion. *Id*. ¶¶ 8-9.

1

If timely constructed by May 2014, the Kemper Plant would qualify for hundreds of millions of dollars in federal incentives and tax credits. *Id*. And, with respect to meeting the $2.88 billion budget, any amount that exceeded the $2.88 billion cap would be borne directly by Southern shareholders, i.e., it could not be recovered by Southern's customers by increasing prices because of conditions imposed by Southern's regulator, the Mississippi Public Service Commission. *Id.* ¶ 9.

Throughout the Class Period, Southern and Deloitte repeatedly assured investors that the May 2014 COD was attainable and on budget, despite knowing or recklessly disregarding facts that indicated otherwise. *Id*. ¶¶ 10-11, 242. As early as 2012 and continuing until 2016, different constituencies involved in the Kemper Plant construction—Southern engineers, the outside scheduling contractor, and the independent monitor—all concluded that Southern's representations to investors regarding the status and cost of the Kemper Plant were false. These constituencies, with no responsibilities relating to Southern's financial statements, came to this conclusion at the same time Deloitte was purportedly (1) auditing the costs of the Kemper Plant, (2) auditing Southern's financial statements in compliance with PCAOB standards, and (3) most importantly, applying special audit procedures designed to address the disclosure-related risks associated with the construction of Southern power plants. Instead of disclosing the true facts that

2

Deloitte knew or recklessly ignored, which would have required Southern to recognize billions of dollars of losses earlier in time when they were reasonably estimable, Deloitte issued unqualified audit opinions throughout the Class Period, and permitted Southern to dribble out more than $6.2 billion in improperly recognized losses over twenty-six (26) quarters. *Id*. ¶¶ 21, 185, 236, 245.

## II.   Argument

### A.   Plaintiff's 10(b) Claim is not Barred by the Statute of Limitations

#### 1.   Applicable Law

The limitations period applicable to 10(b) claims "does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (internal quotation marks omitted). "In other words, the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 174 (2d Cir. 2011).

3

"Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840 (11th Cir. 2004) (citing *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)).

   2.    <u>The Limitations Period for Claims Against Deloitte Began Running in February 2020</u>

Deloitte's claim that the limitations period expired "no later than" August 2017, *see* Mot. at 12, ignores the significance of Deloitte's disclosure in February 2020 of the specific procedures it acknowledged it was required to employ to address disclosure-related uncertainties associated with the construction of Southern power plants. *See* Compl. ¶¶ 257-263. Specifically, Deloitte disclosed on February 23, 2020, in connection with the 2019 Southern audit report, that the "identification and disclosure of events and uncertainties," relating to the construction of the Vogtle plant, which was another Southern plant under construction at the same time as the Kemper Plant, was a critical audit matter ("CAM") as defined by the PCAOB. *Id.* ¶ 261, Compl. Ex. A. And, significantly, in the same report, Deloitte described various steps that it took to address the CAM, which included but were not limited to "test[ing] the effectiveness of internal controls over the on-going evaluation, monitoring, and disclosure of

4

matters related to the construction and ultimate cost recovery of" the plant, engaging "construction specialists" to help evaluate the processes for on-going evaluation and monitoring of the construction schedule, and "inquir[ing] of . . . officials and project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts." *Id.* ¶ 262.

Deloitte's self-described action plan for addressing CAMs relating to the construction of Southern plants provided Plaintiff an adequate basis to allege that Deloitte acted with scienter. There is every reason to believe, and Deloitte does not contend otherwise, that the uncertainties associated with the construction of the Kemper Plant were required to be identified as a CAM, and that the very same procedures, at a minimum, were required to be employed by Deloitte to address the CAM. As explained further below, in view of the credible and widespread allegations by Southern employees of deception and mismanagement in relation to the Kemper Plant, *see infra* at II.C.2, and serious disclosure-related concerns raised by third parties involved in the construction of the Kemper Plant, *id.*, it strains credulity to conclude that the application of these procedures would not have revealed to Deloitte that:

5

(1) the Kemper Plant was not going to be completed and operational within the time and budget estimates disclosed by Southern to investors, causing the excess costs to be borne by shareholders and making it all but certain that Southern would be required to repay hundreds of millions of dollars in incentives and guarantees, *id*. at ¶¶ 9, 48, 64, 68, 121;

(2) the losses incurred by Southern in connection with the Kemper Plant construction were not properly recorded at the time they were reasonably estimable, *id*. at ¶¶ 14, 92, 185; and

(3) Southern was improperly recording billions of dollars in Kemper Plant construction work in progress as an asset in violation of ASC 98-360, *id*. at ¶¶ 18, 241.

In sum, it was the February 2020 disclosure, not the mere fact that Deloitte audited the financial statements of Mississippi Power or performed audit procedures relating to the Kemper Plant costs, *see* Mot. at 11-13, that particularized the facts giving rise to Deloitte's scienter.

Accordingly, the Court should deny Deloitte's motion to dismiss on statute of limitation grounds, or, in the alternative, defer ruling on the statute of limitations defense pending completion of discovery. *See 100079 Canada, Inc. v. Stiefel Lab'ys, Inc*., 2011 WL 13116079, at *7 (S.D. Fla. Nov. 30, 2011); *In re Bare Escentuals, Inc. Sec. Litig*., 745 F. Supp. 2d 1052, 1080-81 (N.D. Cal. 2010); *Vassilatos v. Ceram Tech Int'l, Ltd*., 1993 WL 177780, at *4 (S.D.N.Y. May 19, 1993).

### B. Plaintiff's 10(b) Claim is not Barred by the Statute of Repose

Deloitte's argument that Plaintiff's 10(b) claim is barred by the five-year statute of repose contained in 28 U.S.C. § 1658(b)(2) should be rejected.

"[S]tatutes of repose begin to run on the date of the last culpable act or omission of the defendant." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 198 L. Ed. 2d 584, 137 S. Ct. 2042, 2049 (2017) (interpreting the repose period applicable to claims under Section 11 of the Securities Act) (emphasis added). For this reason, where, as here, a Plaintiff alleges a violation of 10(b) based on a series of misrepresentations and omissions, "the majority of courts" have held that the repose period begins to run from the date of the last alleged misrepresentation or omission. *See McCullough v. Advest, Inc.*, 2017 WL 3675787, at *3 (W.D. Pa. Aug. 25, 2017), *aff'd*, 754 F. App'x 109 (3d Cir. 2018) ("Although the law in this area is somewhat unresolved, the majority of courts have held that the statute of repose in § 1658(b)(2) begins to run on the date of the last alleged misrepresentation regarding related subject matter."); *see also In re Dynex Capital, Inc., Sec. Litig.*, 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009) (same); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012) (same); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 2148919, at *5 (S.D.N.Y. Sept. 6, 2005) (same); *Aronson v. Advanced Cell Tech., Inc.*, 902 F.

Supp. 2d 106, 128 (D. Mass. 2012) (same) (quoting *Winters v. Stemberg*, 529 F. Supp. 2d 237, 246 (D. Mass. 2008)).[1] Deloitte's clean audit report issued as recently as February 20, 2020 on Southern's 2019 Form 10-K was knowingly or recklessly false and misleading. Accordingly, Plaintiff's claims based on Deloitte's pre-February 2017 false and misleading statements are not barred by the five-year repose period under 28 U.S.C. § 1658(b)(2).

In the alternative, if the Court is inclined to dismiss Plaintiff's pre-February 2017 claims on statute of repose grounds, Deloitte's position—that the 10(b) claim

---

[1] There is contrary authority such as *Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 807 (S.D.N.Y. 2015), *see* Mot. at 13, which holds that the repose period begins to run at the time of each alleged misrepresentation or omission. *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391 (S.D.N.Y. 2019); *Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 465 (S.D.N.Y. 2017). We have not located controlling authority from the Eleventh Circuit on this issue, and respectfully submit that this case is a prime example of why the repose period should not begin to run at the time of each alleged misrepresentation or omission. Statutes of repose are designed to provide certainty to defendants that have ceased engaging in allegedly actionable conduct, *see Shepard v. Philip Morris, Inc.*, 1998 WL 34064515, at *4 (M.D. Fla. Apr. 28, 1998) ("The policy underlying statutes of repose is that there must come a time when a potential defendant ought not to be called on to defend a claim when the evidence has been lost, memories have faded, and witnesses have disappeared."), not to help defendants engaged in long-running fraudulent schemes mitigate their liability. Here, the policy behind the statute of repose would not be served by allowing Deloitte, which permitted Southern to dribble out more than $6.2 billion in losses over twenty-six (26) quarters, to reduce its liability for pre-February 2017 misstatements.

should be dismissed in its entirety because Plaintiff, having purchased Southern stock in 2015, cannot establish reliance on Deloitte's post-February 2017 statements—should be rejected. The proposed class includes purchasers of Southern stock after February 2017, and Deloitte does not cite a single case that would call for dismissing their 10(b) claims because Plaintiff purchased his stock prior to February 2017. Deloitte's argument is, at bottom, a challenge to whether Plaintiff can establish typicality under Fed. R. Civ. P. 23(a)(3), which is a question properly before the Court on a motion for class certification as opposed to a motion to dismiss.[2]

### C.   Plaintiff's Complaint Adequately Alleges Scienter

####   1.    Applicable Law

"[S]cienter consists of intent to defraud or severe recklessness on the part of the defendant." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 790 (11th Cir. 2010) (internal quotation marks omitted). In assessing whether a complaint sufficiently alleges scienter, courts must consider "all of the

---

[2] In any event, Plaintiff's inability to establish reliance on Deloitte's post-February 2017 misstatements will not prevent this Court from certifying the proposed class. *See In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 648 (N.D. Ala. 2009) ("Inevitably, in cases where a lead plaintiff has been selected under the requirements of the PSLRA, a lead plaintiff may not have standing to sue on every available claim. In such cases, as here, additional named plaintiffs may be needed to aid the lead plaintiff in representing the class.") (internal citations omitted).

facts alleged, taken collectively . . . not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323 (2007). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. If the inference of scienter is "at least as compelling" as any plausible opposing inference, the complaint must be sustained. *Id.*

In auditor liability cases under the federal securities laws, plaintiffs must plead facts that "give rise to a strong inference" that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Brophy v. Jiangbo Pharms., Inc*., 781 F.3d 1296, 1307 (11th Cir. 2015).

       2.    <u>The Allegations in the Complaint Give Rise to a Strong<br>Inference that Deloitte Acted with Scienter</u>

Plaintiff has sufficiently alleged that Deloitte's audits of Southern were "no audits at all" and that "no reasonable accountant" would have issued unqualified audit opinions on Southern's financial statements during the Class Period.

To begin with, Deloitte's involvement in the Kemper Plant construction was extensive, and it knew that achieving the May 2014 COD at a cost not exceeding $2.88 billion was critical to Southern investors. Compl. ¶ 44 (explaining that, based on MPSC's approval, any costs exceeding $2.88 billion as well as any costs incurred after the May 2014 COD could not be passed onto Mississippi Power customers and thus, would be borne by Southern's shareholders). Under PCAOB Standards, Deloitte was required to, *inter alia*, understand Southern's business and obtain a "high level" of assurance by obtaining audit evidence that Southern's financial statements were free of material misstatements, particularly regarding Southern's estimated cost of completion of the Kemper Plant. *Id.* ¶ 209; *see also* October 11, 2022 Statement by Paul Munter, SEC's Acting Chief Accountant (Declaration of Alexis P. Federico ("Federico Decl."), Ex. 1) (explaining that "[i]t is critical for auditors to be alert to financial reporting areas that may be more frequently related to fraudulent schemes, such as . . . the intentional misstatement of accounting estimates"). PCAOB's Standards, as acknowledged by Deloitte in relation to the Vogtle Plant, also required Deloitte to identify the uncertainties associated with the construction of the Kemper Plant as a CAM, and employ specific procedures to address the CAM, *e.g.*, engaging "construction specialists to assist" Deloitte in evaluating Southern's "processes for on-going evaluation and

11

monitoring of the construction schedule and to assess the disclosures of the uncertainties impacting the ultimate cost recovery of its investment in the construction of" the Kemper Plant. *Id*. ¶¶ 221, 262. Deloitte, in view of the procedures it concedes it was required to employ to address CAMs relating to the construction of Southern power plants, and the fact that it audited the costs of the Kemper Plant itself, placed it in a position with far greater access to information about the status of the Kemper Plant construction than a typical financial statement auditor. *See id*. ¶ 241 (alleging that Deloitte had access to "key communication and project management and status reports, planning documents, budget estimates, key deliverables, interviews with project managers and engineers, the Independent Monitor's reports, orders and communications between Southern and its regulators, [and] capital expenditure summaries"). Therefore, the allegations regarding Deloitte's unique role in relation to the Kemper Plant construction extend beyond the generic "access allegations" described by Deloitte, *see* Mot. at 2, and are "the lens through which" to view Deloitte's intentional, or at least reckless, violations of PCAOB Standards. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 653 (E.D. Va. 2000) ("But it is equally apparent that the greater PwC's access to and involvement with MicroStrategy's operations, the more support an inference of scienter takes on. Put another way, the alleged nature and level of PwC's access

12

to MicroStrategy serve as the lens through which PwC's specific GAAS and GAAP violations must be viewed.").

Deloitte's unfettered access to information about the Kemper Plant construction and its self-described duty to apply the heightened scrutiny associated with the identification of an accounting matter as a CAM are significant because individuals internal and external to Southern—with fewer resources than Deloitte and no responsibilities to ensure that the SEC filings fairly presented Southern's financial condition—came to the conclusion that Southern's representations about the estimated cost and completion time of the Kemper Plant were materially misleading. As early as 2012, Southern employees and others working on the project recognized that the May 2014 COD disclosed by Southern was unattainable. *See* Compl. ¶ 51 (in 2012, "Wingo[, a Southern engineer,] told his supervisors that other scheduling information that Mississippi Power and Southern were providing to the public was infeasible and misleading"); *id*. ¶ 55 (a scheduling consultant who worked on the Kemper Plant for about eight months in 2012 described Southern's disclosed schedule as "a pretty picture to show everybody that we're all doing wonderful as opposed to what reality showed on the ground"). Third parties, including the scheduling contractor, PM Alliance, and the independent monitor, BREI, repeatedly raised concerns that Southern was

13

misrepresenting its progress on the Kemper Plant to investors. *See, e.g., id.* ¶ 61 (BREI published a report in November 2012 that found that the Southern would not meet the May 2014 COD and the cost would exceed $3 billion.); ¶ 59 (PM Alliance resigned in February 2014 because the project plan did not "fairly and accurately" represent the remaining work to be completed, and "warned Southern that it could not support using hypothetical and misleading information in a published schedule that could ultimately be used by investors, regulators, and the public."). The fact that Southern employees and third parties, who were not, *e.g.*, required to "inquire[]" of "project managers regarding the status of construction, the construction schedule, and cost forecasts to assess the financial statement disclosures with respect to project status and potential risks and uncertainties to the achievement of such forecasts," ¶ 262, knew that the May 2014 COD at a budget not exceeding $2.88 billion was unattainable raises the compelling inference that Deloitte either arrived at the same conclusion or recklessly ignored that reality.

Furthermore, over the multi-year period that culminated with the abandonment of the Kemper Plant, Deloitte was confronted with red flags that it ignored. Deloitte's claim to the contrary, *see* Mot. at 21, is wrong. First, that there were years of missed deadlines and blown budget estimates is a red flag on its own. *Cf.* KPMG's Audit Committee Institute, *Accounting Judgments, Estimates,*

14

*and Restatements: Implications for Audit Committee Oversight*, 9 (2007) (identifying as a "potential red flag[]" "[f]requent and significant changes in estimates for no apparent reason, increasing or decreasing reported earnings").[3] Between July 28, 2010, when the Kemper Plant project was announced, and June 2017, when Southern announced that it was suspending its clean coal efforts, Southern published a change in the estimated completion date at least 13 times (Compl. ¶¶ 119, 121, 125, 134, 144, 161, 166, 167, 169, 170, 171, 173, 175, 176, 178), and revised upward its budget estimates at least 24 times (*id*. ¶¶ 79, 83, 106, 110, 115, 121, 125-126, 128, 136, 147-149, 155, 157, 158, 160, 162, 165, 166, 169, 173, 177, 179-181). These constantly shifting targets should have caused an auditor exercising "professional skepticism," *id*. ¶ 211, to (1) question the integrity of Southern's forecasting ability, (2) require Southern to incur Kemper Plant losses far earlier in time, (*id*. ¶¶ 4-5, 236) and (3) significantly reduce the asset value of the construction work in progress on Southern's balance sheet. *Id*. ¶¶ 195, 236. Second, the revelations contained in the July 5, 2016 New York Times article about fraud and mismanagement at Southern, which was followed close in time with the announcement of an SEC investigation and later a DOJ investigation (Federico Decl., Ex. 3), also constituted a glaring red flag. At that point, a

---

[3] Federico Decl., Ex. 2.

reasonable accountant would have conducted an investigation and, with the threat of resigning as the auditor, instructed Southern to disclose the truth about the viability and cost of the Kemper Plant project. Deloitte did the opposite. Approximately one month after the New York Times article, Southern filed a Form 10-Q for the second quarter of 2016, which disclosed $81 million in losses associated with the Kemper Plant and claimed billions of dollars in construction work in progress as an asset. Compl. ¶ 166.[4] Deloitte thereafter signed off on three separate Southern SEC filings, the Form 10-Q for the third quarter of 2016, the Form 10-K for 2016, and the Form 10-Q for the first quarter of 2017, before finally disclosing more than **$3 billion** in Kemper Plant losses in the Form 10-Q for the second quarter of 2017. *Id*. ¶ 179.

The deep involvement of Deloitte in the Kemper Plant, the multiple constituencies within and outside of Southern that worked on the project that recognized that Southern's representations were false and misleading, and the red flags presented to Deloitte make it inconceivable that Deloitte complied with PCAOB standards by obtaining sufficient audit evidence that (1) the Kemper Plant

---

[4] Southern's Second Quarter Form 10-Q at p. 97 (claiming $2.429 billion as construction work in progress), available at https://www.sec.gov/Archives/edgar/data/0000003153/000009212216000179/so_10qx6302016.htm and at https://investor.southerncompany.com/financials-and-sec-filings/sec-filings/default.aspx.

16

would be completed within the time and budget estimates disclosed by Southern; (2) the losses incurred in connection with the Kemper Plant were properly estimated and recorded as losses at the time they were reasonably estimable; and (3) Southern could properly claim billions of dollars in construction work in progress as an asset on its balance sheets in compliance with ASC 98-360. Courts have found such allegations sufficient to alleging scienter against an auditor at the pleading stage. *See, e.g.*, *In re MicroStrategy*, 115 F. Supp. 2d at 656; *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *10-11 (N.D. Ill. Nov. 4, 1998); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *5 (E.D. Tenn. Aug. 2, 2018).

*Samuel R. Floyd, III, et al. v. Deloitte & Touche, LLP, et al.*, Case No. 3:19-cv-03304-MBS (D.S.C.) ("*Floyd*") is particularly instructive. There, in a case with strikingly similar facts as here, an investor in a securities class action alleged that "Deloitte violated its professional responsibilities, failed in its role of gatekeeper, and deceived investors about SCANA's accounting for and expected completion" of the construction of a nuclear plant. Dkt. No. 64 at 76:3-7 (Federico Decl. Ex. 4). In finding that the plaintiff sufficiently alleged scienter against Deloitte, the

17

Honorable Margaret B. Seymour relied on the same allegations that Plaintiff makes

here, namely, that:

> (1) "Deloitte was responsible for understanding significant reports from external consultants, such as Bechtel, as well as internal reports issued in connection with the project," *compare* Dkt. No. 64 at 81:23-82:1 *with* Compl. ¶ 215;

> (2) "Deloitte was required to understand SCANA's business and identify and respond to risk of material misstatements affecting SCANA's financial statements," *compare* Dkt. No. 64 at 82:9-12 *with* Compl. ¶¶ 212, 215, 216, 226;

> (3) "Deloitte failed to properly assess the risk that a material weakness existed in SCANA's internal controls over financial reporting," *compare* Dkt. No. 64 at 82:13-15 *with* Compl. ¶ 243;

> (4) "Deloitte was required to determine whether statements made to the PSC were accurate and indeed had ample evidence that SCANA's representations to the PSC were false," *compare* Dkt. No. 64 at 82:16-19 *with* Compl. ¶¶ 50, 60, 73, 78, 139, 213, 215, 219, 221, 223, 224;

> (5) "Deloitte should have tested the effectiveness of internal controls over the ongoing evaluation and monitoring of the construction schedule and cost forecasts for the project," *compare* Dkt. No. 64 at 82:23-83:1 *with* Compl. ¶¶ 14, 219, 221, 244, 262; and

> (6) "Deloitte could not have believed its representations given the Bechtel Reports, monthly progress reports, and other internal correspondence that describe deficiencies in the progress of the project." *compare* Dkt. No. 64 at 83:2-6 *with* Compl. ¶¶ 215, 236, 237, 241, 250.

Here too, the Court should find that the scienter allegations against Deloitte are

sufficient.

18

In arguing that the allegations are inadequate under the PSLRA, Deloitte ignores large swaths of the Complaint and addresses the allegations in isolation rather than "holistically," *see In re Health Ins. Innovations Sec. Litig.*, 2019 WL 3940842, at *27 (M.D. Fla. June 28, 2019), as required. Plaintiff is not relying on any single factor, such as violations of PCAOB standards, on its own. As explained above, the allegations, considered collectively, give rise to a strong inference that Deloitte acted with scienter. In claiming otherwise, Deloitte asks this Court to accept the implausible, that a "Big 4" accounting firm, applying the heightened scrutiny associated with a CAM designation to disclosures about the Kemper Plant and auditing the costs of the project itself, was, at most, negligent notwithstanding widespread allegations by Southern employees of deception and mismanagement (Compl. ¶¶ 49-58), serious disclosure-related concerns raised by third parties involved in the construction of the Kemper Plan—e.g., the scheduling contractor's warnings and subsequent resignation amidst concerns that the project's published schedule contained hypothetical and misleading information (*id*. ¶ 59) and the project manager's warnings that the construction estimates and scheduling times were "illogical" (*id*. ¶¶ 61-64)—revelations of major delays in project tasks that could not be remedied (*id*. ¶ 68), Southern's repeated failure to meet significant milestones (*id*. ¶ 71), incomplete work packages that were knowingly and falsely

19

advertised as completed (*id.* ¶ 76), at least 13 changes to the estimated completion date, and at least 24 changes to the proposed budget—many of which occurred consecutively quarter after quarter. The far more compelling inference is that Deloitte, reluctant to do anything to threaten its lucrative relationship with Southern, turned a blind eye, and issued false and misleading audit opinions with scienter.

**D.      Plaintiff Has Alleged the Falsity of Deloitte's Opinions with the Requisite Specificity**

Deloitte offers four reasons why the Complaint fails to allege material misstatements or omissions with the requisite "specificity," each of which lacks merit.

*First*, Deloitte's unqualified audit opinions, which included a representation to investors that the audits were conducted in accordance with PCAOB standards, Compl. ¶ 232, were false and misleading because, as alleged, Deloitte conducted "no audit[] at all." *Id.* ¶¶ 230-250, 266-67; *see also In re: Petrobras Sec. Litig.*, 2016 WL 1533553, at *4 (S.D.N.Y. Feb. 19, 2016) ("PwC's audit opinions would be of no use to anyone if they announced, without any basis in the content of the financial statements or other evidence, that a company's presentation of its financial health was sound."). Plaintiff's allegations sufficiently explain why

20

Deloitte's opinions are actionable misstatements, Compl. ¶¶ 230-250; Deloitte's complaints about "puzzle pleading," therefore, ring hollow.

*Second*, Deloitte's claim that the Complaint does not "specify the amounts of any misstatements" is not only untrue, but it is also not a sufficient basis to dismiss the Complaint. The Complaint alleges that billions of dollars of Kemper Plant-related losses were required to be recognized earlier because, as explained *supra* at II.C.2, Southern and Deloitte knew early on that the May 2014 COD at a cost not exceeding $2.88 billion was unattainable.[5] Moreover, the PSLRA does not require a plaintiff to specify the amounts by which an issuer's financial statements were misstated. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79-82 (1st Cir. 2002) (failure of complaint to document precise amounts of overstatements of revenue not fatal); *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999)

---

[5] For this reason, *In re Allied Capital Corp. Sec. Litig.*, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ("*Allied*") is inapposite. There, the plaintiffs pursued a claim for securities fraud based on the allegation that certain securities were overvalued but failed to "state by how much" the defendant "overvalued the investments." *Allied*, 2003 WL 1964184, at *5. In granting the motion dismiss, the Court ruled that absent an allegation regarding "the extent of" the alleged overvaluation, the Court could not "assess the magnitude and materiality of the fraud." *Id*. Here, by contrast, the Complaint alleges that $6.2 billion in losses—an indisputably material figure to Southern investors—were trickled out over 26 quarters as opposed to being recognized earlier in accordance with PCAOB standards.

("Plaintiffs need not state the amount by which USN's financial statements were in error.").

*Third*, the allegations against Deloitte do not rest on the "fraud-by-hindsight" claim that because the Kemper Plant costs ultimately exceeded the $2.88 billion cap, losses should have been recognized earlier. As detailed in II.C.2 *supra* (discussing scienter), Deloitte knew or was reckless in not knowing that Southern was consistently under-reporting losses associated with the Kemper Plant while, at the same time, over-stating Southern's assets by billions of dollars by improperly including construction work in progress on the Kemper Plant. *See* Compl. ¶ 236.

Finally, Deloitte criticizes Plaintiff for "not specify[ing] which Deloitte statement regarding its compliance with auditing standards was false, much less offer[ing] any supporting facts, including which PCAOB standards Deloitte allegedly violated in which audit." Mot. at 18. But that ignores more than two dozen paragraphs in which Plaintiff lays out the governing PCAOB standards, how they relate to Deloitte's false opinions, and how they were violated, in detail. *E.g.*, ¶¶ 204-229. In *Floyd*, the court held functionally identical allegations sufficient "even under the heightened standards applicable in this case." Dkt. No. 64 at 79:7-8 (the plaintiff "lists numerous ways in which they contend Deloitte disregarded obligations

22

recognized by the Public Company Accounting Oversight Board," coupled with descriptions of "memoranda," "reports," and "presentations that contradicted assertions made by SCANA . . . that the project would" meet time and cost projections. *Id.* at 80:17-81:1.

### E.  Plaintiff's Complaint Adequately Alleges Loss Causation

Loss causation is subject to Rule 8 notice pleading, which "is satisfied if plaintiff provides 'a short and plain statement adequate to give defendants some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1347 (N.D. Ga. 2012) (quoting *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1203-04 (N.D. Ga. 2007)). Plaintiff need only "show that the misrepresentation touches upon the reasons for the investment's decline in value." *Ebix*, 898 F. Supp. 2d at 1347 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (internal citations omitted)).

Judge Seymour in *Floyd* found that loss causation was adequately alleged, holding that "Deloitte's alleged misconduct, including its issuance of clean audit reports, concealed and dramatically understated foreseeable risks that SCANA would not complete the project in time" and that "SCANA's common stock los[t] value when the conceal[ed] risks were revealed." *Floyd*, Dkt. No. 64 at 83:6-14. In

23

other words, "SCANA's financial statements hid the true status of the project which Deloitte was aware of." *Id.* at 83:15-17.

Here too, Deloitte's liability arises from the issuance of "clean" audit opinions that consistently and materially "understated foreseeable risks" that the Kemper Plant would not be completed on time and within budget. When the risk concealed by Deloitte's opinions materialized—when Southern was forced to admit that the May 2014 COD was unattainable and when Southern began disclosing increasing losses once the $2.88 billion cap was breached—the market value of Southern's stock diminished, *see*, *e.g.*, *id.* ¶ 21. *See City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1297 (N.D. Ga. 2011) (to satisfy the loss causation element, plaintiffs can allege that the share price fell "after the truth became known . . . or that Defendants' misstatements or omissions concealed a foreseeable risk that ultimately materialized"); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *26 (S.D. Fla. Aug. 18, 2010) ("the revelation of the concealed risk need not take the form of a corrective disclosure; a plaintiff may also prove loss causation by proving that the concealed risk materialized in a foreseeable way and that this 'materialization of the risk,' led to a decline in share price"). Plaintiff's allegations

24

thus more than sufficiently provide Deloitte "some indication of the loss and the causal connection that the plaintiff has in mind." *Ebix*, 898 F. Supp. 2d at 1347.

### F.     Deloitte LLP is a Proper Defendant

Defendants also argue that Plaintiff's claims against Deloitte LLP must be dismissed because "Plaintiff does not and cannot allege that Deloitte LLP made any statement, because Deloitte LLP was not Southern's auditor." Mot. at 23-24. That is a red herring. The Complaint alleges that Deloitte LLP had involvement in, and control over, Deloitte & Touche, LLP, Compl. ¶¶ 27-28, which is all that is needed to survive the pleading stage. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 288-89 (S.D.N.Y. 2005).[6]

## III.   Conclusion.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.[7]

---

[6] Deloitte also argues that Plaintiff's Section 17(a) claim is not cognizable. The complaint acknowledges that "the Eleventh Circuit [does not appear to] recognize[] a private right of action under Section 17(a)[,]" and explains that Plaintiff is "bring[ing] this cause of action to preserve it for appeal" given that "[t]he Supreme Court has not ruled on this issue yet[.]" Compl. at ¶ 1 n.1.

[7] If the Court believes any allegations are deficient, Plaintiff respectfully requests leave to amend his Complaint.

Dated: October 14, 2022              **GORDON BALL, LLC**

                                      */s/ Gordon Ball*
                                     Gordon Ball, Esq. (TN Bar No. 001135)
                                     *Admitted Pro Hac Vice*
                                     gball@gordonball.com
                                     3728 West End Avenue
                                     Nashville, Tennessee 37205
                                     Tel: (865) 525-7028

                                     *Counsel for Plaintiff*

                                     **BIENERT KATZMAN LITTRELL
                                     WILLIAMS LLP**

                                     */s/ Thomas H. Bienert*
                                     Thomas H. Bienert, Jr. (CA Bar No. 135311)
                                     *Admitted Pro Hac Vice*
                                     tbienert@bklwlaw.com
                                     Alexis Federico (CA Bar No. 313392)
                                     *Admitted Pro Hac Vice*
                                     afederico@bklwlaw.com
                                     903 Calle Amanecer, Suite 350
                                     San Clemente, CA 92673
                                     949-369-3700

                                     *Counsel for Plaintiff*

                                     **WARREN & GRIFFIN, PC**

                                     */s/ John McCown*
                                     c. Mark Warren (GA Bar No. 738210)
                                     cmark@warrenandgriffin.com
                                     John McCown (GA Bar 486002)
                                     john.mccown@warrenandgriffin.com
                                     300 West Emery, Suite 108
                                     Dalton, GA 30720

26

706-529-4878

*Local Counsel for Plaintiff*

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

By: /s/ Alexis Paschedag Federico.
Alexis Paschedag Federico (CA Bar 313392)
admitted *pro hac vice*
afederico@bklwlaw.com
**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel: (949) 369-3700

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this day a copy of the foregoing was filed and served using the Court's CM/ECF system, which will send notification of such filing to ECF registered participants. Executed this 14th day of October 2022.

By:  */s/ John McCown*
     John McCown (GA Bar 486002)
     john.mccown@warrenandgriffin.com
     **WARREN & GRIFFIN, PC**
     300 West Emery, Suite 108
     Dalton, GA 30720
     Tel: (706) 529-4878

     *Local Counsel for Plaintiff*